## NOMATH HOTEL COMPANY, Respondent, v. KANSAS CITY GAS CO., Appellant.

Kansas City Court of Appeals, May 10, 1920.

1. **EXPLOSIONS: Escape of Gas: Negligence: Res Ipsa Loquitur.** A gas company is not an insurer, but is held to a degree of care commensurate with the dangerous character of the commodity it handles. The mere fact of an explosion does not make out a prima-facie case or raise a presumption of negligence, the doctrine of *res ipsa loquitur* not applying.

2. ———:———:———: **Petition Construed.** A petition which alleges that the defendant negligently permitted a large quantity

of gas to escape from the gas main adjacent to the premises occupied by the plaintiff charges a defect only at said main adjacent to plaintiff's premises, and is not broad enough to permit the introduction of evidence of a defect at a place 125 feet away and on the opposite side of the street.

3. ———: ———: **Evidence.** Evidence examined and held sufficient to justify the jury in finding that the explosio nwas one of natural gas, and that it was not an explosion of gas escaped from a disconnection in plaintiff's premises.

4. **NEGLIGENCE: Pleading: Proof: Demurrer to Evidence.** In passing on a demurrer to the evidence the court cannot consider evidence adduced by the plaintiff establishing negligence other than the negligence pleaded if it rules that under the allegations of the petition such evidence was properly excluded.

5. **CONTRIBUTORY NEGLIGENCE: Matter of Law.** Installation of a "booster pump" without permit from the city therefor, held not to be contributory negligence as a matter of law.

Appeal from Clay Circuit Court.—*Hon. Frank P. Divelbiss,* Judge.

REVERSED AND REMANDED.

*Cooper, Neel & Wright* for respondent.

*Simrall & Simrall, J. W. Dana* and *Charles M. Miller* for appellant.

TRIMBLE, J.—A terrific explosion of gas wrecked the basement office and kitchen of plaintiff's Cafe located near the southeast corner of 12th street and Baltimore Avenue in Kansas City, Missouri. This suit was brought against the gas company resulting in a judgment for $5500 from which the defendant has appealed.

Baltimore Avenue runs north and south, and the basement, which is on the east side thereof, began under the sidewalk at the concrete wall under the curb line, and, with a north and south width of about fifty feet, ran back east to an alley. The basement was divided into three rooms: One, called the office room, about 8 by 20 feet, was in the southwest corner under the side-

walk and extended from said concrete wall at the curb
line east to the limit of the room's dimension in that
direction; another, the "service-bar room," where
drinks were prepared to be served in the cafe, was im-
mediately north of the office room; and the third, which
was the kitchen, occupied the rest of the basement and
extended from the two small rooms west about ninety
feet to the aforesaid alley.

The walls of the first mentioned or office room, on
all sides except the east, were of heavy concrete founda-
tional construction; while the east wall, the partition
between the office and the kitchen, was a light six inch
wall of terra cotta. The office room had a door on the
east side close to the south wall permitting entrance
thereto from the kitchen, but otherwise it was without
opening, having neither window nor transom. The side-
walk above it consisted of concrete slabs with heavy
art-glass prisms or lenses therein to allow light to enter
and shine through the glass in the ceiling, which was
about nine or ten feet above the floor. In the service-
bar room was the gas meter and also a gas "booster"
pump, operated by a small electric motor, the switch
for turning on the current of which was in the north-
west corner of the office room close to the ceiling. There
were no gas pipes, connections or gas fixtures of any
kind in the office room. The gas service pipe entered
the service-bar room where the meter was.

In the center of the kitchen was a hood having a
ventilating shaft which ran east to the end of the room
and thence up to the outer air; and over the end of this
shaft was a fan to draw the smoke, fumes, etc., from the
kitchen and thus keep it properly ventilated.

The door between the kitchen and the office room
had constantly remained open from the time the cafe
was opened for business in November, 1917, until Fri-
day night, March 29, 1918, preceding the explosion
(which occurred on Sunday morning March 31, about
11 o'clock.) On said Friday night, however, this door
was for the first time closed and locked and the entire

cafe was closed and remained so until Sunday morning as hereinafter related.

On said Sunday morning about 10:30 o'clock, a kitchen employee, who had begun working there a month previous, together with the chef and a pot-washer, who had been employed there only three or four days, and the assistant engineer, entered the basement after getting the keys from the proper authorities. The employees were intending to do some work therein, but preparatory thereto, desired to start the gas range in order to cook themselves something to eat. The chef, therefore, directed the kitchen employee, Enderman, to turn on the switch to the gas pump in order to pump gas into the range. Enderman unlocked the door to the office room, went in and got upon a chair to turn on the switch, located as we have said in the northwest corner near the ceiling. The turning on of this switch always made a spark and did so this time, but nothing unusual happened. Enderman came out of the office room and closed and locked the door. The mere turning on of the switch started the gas pump to working, but in about three or four minutes the chef called to him and said there was no gas and that he might as well turn off the switch. Enderman again unlocked the office room door, got upon the chair and turned off the switch. As he did so a spark was generated, as before, and a bluish flickering flame, starting in the switch box, went around over the box following the ceiling a short distance and then the explosion occurred. It took an eastward direction and tore out the east terra cotta wall and wrecked everything in its pathway eastward into and half way through the kitchen, throwing over and partially wrecking a one-and-one-half ton refrigerator, moving the gas range and killing one of the men in the kitchen. In the office room the explosion tore through the ceiling, lifted up and broke the sidewalk concrete slabs containing the prism lights, and Enderman was thrown from the chair to the floor, luckily escaping uninjured, doubtless because he was in the corner at the angle formed by two massive

walls of masonry where the full force of the explosion was prevented from exerting itself in that direction.

The petition set up that, for the purpose of supplying natural gas to the general public, the defendant maintained mains, pipes and other conduits under the public streets of Kansas City and particularly a certain main running north and south under the east side of Baltimore Avenue, equipped with a valve and valve box to control the flow of gas into plaintiff's basement; that said main, pipes and pipe lines under Baltimore Avenue were close to a water pipe, fire hydrant, water-valve and valve box connected with said basement so that natural gas escaping from the former would seep and leak into and around the latter and from thence get into and accumulate in said office room. The petition then went on to charge that defendant—

"Negligently and carelessly caused and permitted a large quantity of natural gas to escape from the gas main, valve and valve box, pipes, piping and other conduits, so owned, operated and maintained by said defendants in and under the east side of Baltimore Avenue aforesaid *adjacent to the premises so occupied by the plaintiff* and to leak and seep from defendant's said main valve and valve box, pipes and pipe lines, through and into and around the said water pipes, valve, valve box and fire hydrant and thence through and around said water drain or waste pipe into plaintiff's basement, and also through the walls and foundations of said seven story buildings in various places."

The defendant denied generally, and then charged contributory negligence in that defendant had, contrary to an ordinance of Kansas City, installed the gas or booster pump without a permit from the plumbing supervisor or the approval of the gas inspector and that in the installation of said pump the pipes had been disconnected in violation of said ordinance, and that if an explosion of natural gas occurred it was caused by a spark from said pump or its appliances.

The first question for our determination is whether the demurrer to the evidence should have been sustained? With reference to this, defendant's contention should be divided into several claims and each considered separately: First, that there was no evidence tending to show that the explosion was one of natural gas defendant was engaged in distributing; second, that even if there be sufficient evidence from which the jury could say the explosion was of such natural gas, there was no evidence tending to make it more reasonably probable that the gas came from a source which would render defendant liable rather than that it escaped from some dis-connection or vent in plaintiff's basement for which defendant would not be liable; third, even if it was natural gas that exploded, there was no evidence of any leaks or breaks in defendant's pipes or main or that gas escaped therefrom; fourth, that even if gas leaked from defendant's pipes or main, there is no evidence tending to show negligence on the part of the gas company.

Considering these claims in their order, we are satisfied that the first is untenable. There was ample evidence to show that it was defendant's natural gas, and not sewer gas, that exploded and wrecked the basement. The man who installed the plumbing in the building and basement when constructed, testified that at the time of such construction and before any gas connections were made or sewer connections completed he was working near the west wall of the office room and thought he detected an ordor of natural gas which seemed to come through said wall. The explosion dislocated some pipes connected with the refrigeration plant and allowed ammonia fumes to escape and fill the basement, so that an immediate entrance into the same could not be made; but on the day of the explosion, and as soon as these ammonia fumes which were non-explosive could be drawn out, an investigation was made which was particiapted in by the city Fire Department, representatives of the gas company, the engineer of the

building, the architect who designed and superintended its construction, and the plumber who installed its plumbing. The building, of which the basement was a part, was one of seven stories in height and was comparatively new. The investigation made by the above named authorities disclosed that the sewer drainage system was complete and well equipped; its connection with the street sewer was at the east end; of the basement; the pipes of said drainage system, and the devices thereon to prevent the entrance of sewer gas into the basement were found to be intact and working well. It is in evidence that natural gas has no distinct ordor and is not easily detected by one not thoroughly acquainted with it or its effect, which is chiefly manifested by a slight constriction or dryness of the throat. Unlike natural gas, sewer gas is readily detected by its ordor, it having a disgusting smell. On Sunday morning, when the employees entered the basement which had been closed since Friday night before, no smell of gas was noticed at any time. There is some claim on the part of the defendant that a can of furniture polish found in the office room after the explosion might have been the origin thereof, but there is evidence that this can was not in the office room, where the explosion took place, at the time of the explosion but was placed there afterward from the kitchen. The evidence is that when it was suggested that the polish might have caused the explosion, an attempt to set fire to it was made but it would not burn. A chemical analysis disclosed that it was combustible only at a temperature of 342 degrees in which a human being could not live. There was a small gasoline tank at the Auto park down the street on the other side of Baltimore Avenue, and it was suggested that gasoline may have been spilled there which in some way got into the basement. But the evidence showed that this tank was leak proof, buried seven feet under ground, was not a regular filling tank, that very little gasoline was ever spilled there and what little was spilled ran down the street in the opposite direction

and there were no sewers or other communication by which gasoline could cross the street and go up grade to plaintiff's basement. Besides, it was shown in evidence that an explosion of gasoline vapor would have occurred in the lower and not the upper portion of the office room. It was also shown in evidence that natural gas is highly inflammable and, when mixed with air, is explosive; that it can be set off by a spark or fire but not in any other way; that, when ignited, natural gas burns with a flame having a bluish appearance, and, even after escaping into a room, that portion of the gas not having air thoroughly mixed into it will merely burn without exploding, but when a portion is reached which has become thoroughly permeated with air, then such portion will explode with terrific force. This corresponds with the phenomena observed at the time of the explosion. Beyond question there was ample evidence tending to show that the explosion was an explosion of gas; and under all of the foregoing circumstances there was ample evidence from which the jury could find it was an explosion of natural gas and not of sewer gas or of other origin.

With reference to the second claim, namely, that it is as likely the gas escaped from a disconnection or vent in plaintiff's basement as that it escaped from defendant's main or pipes, the evidence discloses the following:

In the investigation made as above stated on the day of the explosion, the gas service pipes in the entire basement were gone over and examined with care. They were found to be in good condition without leaks or breaks of any kind. The gas range, which was about forty feet in length, had been slightly moved from its position by the force of the explosion and the connection with the gas pipe was broken close to the range, but aside from this the gas pipes, meter and connections were in perfect order. There was evidence that they were all, including the range connection. in perfect condition, on Friday night when the cafe was closed. At the time the cafe was closed, and for a period of several days after the explosion, a

general strike existed all over the city among the Cooks and Waiters Union. And from this, defendant argues that the explosions may have been caused by some one in that connection. The defendant had evidence tending to show that the pressure in the gas mains on Sunday morning was normal; and it is argued that when the booster pump was turned on at the direction of the chef, its operation necessarily would have forced gas into the range and, as it did not, the gas must have escaped into the basement before it reached the range; and it is suggested that some one, perhaps the chef himself, disconnected the range from the service pipe so that during the few minutes the pump was in operation a large amount of gas was forced into the basement through the disconnection at the range and that it was this gas that exploded. The chef was not put upon the stand nor was his absence therefrom accounted for in any way. But according to the evidence, there was no strike of the employees at plaintiff's cafe, as it had complied with the demands of the Union, and the employees were all satisfied and without complaint. The evidence is that the cafe was not closed because of the strike, nor for fear of violence, but because the cafe was unable to procure clean linens and other supplies, owing to a strike among the laundries of the city and other conditions. Again the explosion did not occur in the kitchen where the range was, but in the office room a considerable distance away from the range, a room which was without opening or outlet except the door which was open only the few moments Enderman was in the office room the two times he entered it. We think the jury could well say that the explosion did not come from gas escaping at the range else it would have occurred in the kitchen near the stove and not have occurred in the office room moving in an eastward direction as it did. The reason booster pumps were installed, as they were in various places throughout the city, was because of the low pressure and insufficient supply of gas in the mains; and under the evidence there was no reason or motive on the part of anyone to wrong-

fully tamper with the gas connection at the range, nor is there any evidence from which an inference can be drawn that some one did tamper with it. The doing of such a thing would have been a crime, hence it cannot be presumed, and the claim, therefore, has nothing more substantial than suspicion to rest upon. The broken connection at the range discovered after the explosion is readily accounted for by the explosion itself. Taking into consideration the foregoing facts on the point now under consideration, *in connection with other facts hereinafter* stated, we do not think it can be rightfully said the evidence is such as to make it just as reasonable that the escaped gas came from a *disconnection* in plaintiff's basement. With regard to the condition of the gas pipes therein in other respects, the evidence shows, as has been stated, that they were all right, but had they been shown to be leaky through no interference, it would have been a matter only of defendant's concern in the absence of any knowledge of same and failure to report on plaintiff's part since the service pipe, fitting and meter on plaintiff's premises, by the express terms of plaintiff's contract with the gas company, remained under defendant's control.

Two days after the explosion, another investigation was made by the same persons as before, with the addition of a chemist and gas expert and also an expert engineer. As bearing further upon the second claim above disposed of, it should be stated that in this investigation the sewer system and gas service pipes, meter, etc., were again gone over and found to be intact and in the condition above stated.

Since the evidence to be considered in connection with the third claim, namely, that no leaks or breaks in defendant's pipes or main nor escape of gas therefrom had been shown, involves also the evidence relative to the fourth claim, to-wit, that even if gas leaked therefrom, no negligence was shown, we will consider the third and fourth claims somewhat together.

At the time of or before the second investigation made as above stated two days after the explosion, the gas company made an excavation just outside the west wall of the basement down to the gas service pipe and connection with the main and a small portion thereof was exposed; another excavation was made outside the wall of the office room at a water hydrant hereinafter referred to and its connection with the water main, the service pipe and water valve box were also exposed. When the above mentioned second investigation was made, it was found that the water and gas mains running north and south under the surface of Baltimore Avenue were only ten inches apart and eight feet from the curb line, that is to say, eight feet from the west wall of the office room hereinbefore described. In the outer edge of the sidewalk, just above this room, was the hydrant above mentioned, the valve box and area way which extended down to a depth of several feet just outside of the west wall of said room. This hydrant was used for flushing the street and extinguishing fires and when it was turned off, after being used, of course the hydrant was full of water which, if left therein, would freeze and burst the pipe, so a drainage valve and pipe were connected therewith in order that when the hydrant was turned off after being used, the water in the perpendicular pipe thereof would drain out through this pipe automatically. This pipe went through the aforesaid west wall into the office room and then ran down to about six inches from the floor where the open end thereof terminated just above a floor drain into the sewer, which was protected by a "trap" to prevent the return of water or sewer gas from the sewer into the room. The gas pipe leading from defendant's gas main to plaintiff's premises ran near to and past the hydrant, valve box and area way and entered the service-bar room which, as stated, was north of the office room. These two rooms, it will be remembered, were separated by a heavy concrete foundational wall. The pipe from the water main to the hydrant ran parallel to and a little lower than the pipe from the gas main to the service-bar room. The

surface of the ground above these pipes and above the Baltimore Avenue main was covered by an asphalt pavement having a heavy concrete base thereby hermetically sealing the surface of the street against the escape upward into the air of any gas leaking from defendant's main. The soil around the gas and water mains and the pipes was porous, the trench into which they were laid being filled with loose clay, earth and broken rock, and just outside the aforesaid west wall of the office room was a cavity, large enough for a man to crawl into, which had been partially filled with porous earth and broken rock.

Through experiments in flushing the hydrant, it was found that not all of the water, draining therefrom after it was closed, ran through the drainage pipe leading into and down close to the sewer drain in the office room as above stated, but much of the water remaining in the hydrant when closed, seeped through the wall of the office room from the hydrant area way, and water had been seeping through the wall at times prior to the explosion, and the wall on the inside of the office room showed stains where water had previously seeped through. It was shown in evidence that natural gas, escaping from a main, will, in time, seep through almost any kind of ground except solid rock, that it will easily percolate through porous or loose soil and will seep through walls or go into any place where water will go and, being lighter than air, will go many places where water will not go.

At said second investigation, when the street pipes and connections had been exposed as above stated, plaintiff's gas expert smelled natural gas not only in the soil around the street main at the place where the service pipe jointed it but also in the soil around the service pipe leading therefrom to plaintiff's premises. He also detected the odor of natural gas in the water valve box. No leaks or breaks, however, were discovered in the service pipe leading from the main to the basement nor in any of its connections nor were any breaks or leaks discovered in the small portion of the main that was un-

covered by the excavation. The presence of natural gas in the soil around these pipes indicated, of course, that there was a leak of gas *somewhere* but no breaks or leaks were found in said service pipes or connections at said place nor in the main itself at the small portion thereof uncovered by the excavation made, hence there is no express affirmative evidence that the gas leaked from the main *there*.

Plaintiff, however, introduced evidence that for several months prior and up to the date of the explosion, blasting with dynamite had been carried on in an excavation at 13th and Baltimore for a large building at that point, which blasting was only 125 feet away; that the effect of blasting is to loosen and break the joints of a gas main and the connections of its service pipe, which are comparatively thin, thus permitting the leakage of gas therefrom; that the effect of such blasting in breaking or dislocating pipes may extend, and had been observed to extend, as far as 200 feet away, while plaintiff's basement was, as stated, only 125 feet distant; that the blasting was of such a violent character as to rock and shake the entire seven story building of which plaintiff's basement was a part, and frequently caused the ground near to and under said building to vibrate. Many disinterested witnesses testified to the character of this blasting and of its effects and none of this was disputed. And one of plaintiff's experts testified that it was possible for the vibrations from the blasting done in the excavation at 13th street to have disturbed and injured the gas main, loosening up its joints and breaking the service connections as far north as 12th street and plaintiff's basement. The gas main passing plaintiff's basement extended southward on Baltimore Avenue past 13th street, surrounded by the same character of porous material as hereinbefore mentioned, and there is an upgrade of about 5 per cent from 13th to 12th street. The evidence is that natural gas escaping from a main into surrounding porous soil will percolate for long distances, and where as in this instance, the surface of the ground is sealed

with a pavement, the gas, not being allowed to escape upward through the surface, will travel for half a mile and more along the mains and around any lateral pipes through the porous soil, and, being lighter than air, will travel this up grade, and, under the pressure to which it is subject under such conditions, it would seep into and accumulate in any open space and go through a wall such as that of the office room and even downward through the water drain pipe into the office room the same as the water had done.

Plaintiff introduced evidence to the effect that some weeks prior to the basement explosion, as a result of the blasting going on in the excavation at 13th and Baltimore Avenue, gas began leaking through the soil at the 13th street side of the excavation and then caught fire; that great difficulty was had by the City Fire Department in extinguishing it, for when put out at one point in the wall of the excavation, the fire would burst forth at another; that, as is usual in all cases of fire, a representative of the gas company was present, and it was not until the gas main had been shut off was it possible to subdue the flames. This evidence of fire and of the escape of gas at said excavation was afterwards excluded by the trial court and while evidence as to fires from escaping gas, elicited by plaintiff's cross examination of defendant's witness, assistant Fire Chief Henderson, was allowed to remain in, it was only allowed for a "limited" purpose; and the court in its instructions told the jury that such evidence was admitted only for the purpose of testing the experience of said witness with fires from gas and for no other purpose whatever, and the jury were particularly instructed that such gas fires on 13th street were not notice nor evidence of notice to defendant of any leak of gas into plaintiff's premises. A fire broke out in plaintiff's basement immediately following this explosion, and said witness had testified in regard to its effects and the inferences to be drawn therefrom. From the facts and circumstances thus far considered, including the evi-

dence introduced by plaintiff as to fires from escaping gas at the excavation on 13th, *but which was excluded,* we have no doubt a reasonable and natural inference could be made by the jury that a defective condition was produced *at some point* on defendant's Baltimore Avenue main; and since the service pipe to plaintiff's basement with its connection to the main and the main itself at that point *were found to be in good condition and not leaking,* the break and leakage must have occurred *down the street* near the excavation at 13th and Baltimore; and have been caused by the blasting; and the reasonable and more probable inference to be drawn from the facts disclosed is that the gas, after leaking at such defective place, traveled from thence along the main through the porous soil surrounding it until the escaped gas came to the cross gas-and-water-service pipes and hydrant, leading to and adjoining plaintiff's basement, and then went along said cross pipes, through the loose soil surrounding them, into the water valve box and hydrant areaway from whence it then seeped into plaintiff's office room and there exploded.

At this point two questions arise: First, in view of the facts as to *a leak at the excavation* and defendant's knowledge thereof which the plaintiff developed but which the court *excluded,* and in view of the *allegations of the petition,* can it be said that, regardless of and omitting all the excluded evidence, sufficient remains in the record to justify a finding that defendant is liable for, or was negligent with regard to, the escape of gas into plaintiff's basement? If this question must be answered in the negative, then a second question arises, namely, is the plaintiff, *under the allegations of its petition,* entitled to rely upon a break or leakage in the main at a place *other than the location of the basement?*

Concerning the first of these two questions, whether under the pleadings, there is sufficient evidence remaining in the record to support the verdict, there is this to be said:

It is true, owing to the very dangerous character of gas and because of its well known tendency to escape from the mains and percolate through the earth into cavities or openings and there burn or explode, causing great injury, the defendant. is charged with a very high degree of care in the transmission and control thereof. [Sipple v. Laclede Gas Light Co., 125 Mo. App. 81,. 90; 2 Thornton on the Law of Oil and Gas, sec. 679, p. 955. A gas company is not an insurer, but is held to a degree of care commensurate with the dangerous character of the commodity it handles. [20 Cyc. 1170.; Taylor v. St. Joseph Gas Co., 185 Mo. App. 537, 539.] But the *mere fact of an explosion* does not make out a prima-facie case or raise a presumption of negligence against the company. [Woodburn v. Union Light, etc., Co., 164 Ky. 29, 33.] The case is not governed by the doctrine of *res ipsa loquitur*. Indeed, it was not bottomed nor submitted upon any such doctrine, and plaintiff disclaims that the case rests upon any such theory, but says that it rests upon the doctrine of *presumed negligence*. But this is only another name for the doctrine of *res ipsa loquitur* if there is nothing except the explosion from which negligence can be inferred. It might appear at first glance that the presence of gas in the soil around the service pipe at its connection with the main, together with the fact that it is possible for blasting to disturb joints as far away as the basement, would be sufficient to enable the jury to infer that the main was defective and leaky at the location of the basement, but the trouble with this view is that no *defects* or *leaks were found in the main or pipes* at that place. On the contrary they were found to be non-leaking, and as shown by evidence adduced by plaintiff but which was excluded by the court, evidently because not within the allegations of the petition, the break or leak was down at the excavation on the corner of 13th and Baltimore Avenue. So that, construing the petition as the trial court evidently construed it, namely, as charging a defect or leak *at the basement,* what is

there in the evidence, left in the record as being properly within the petition, from which the jury could infer negligence with reference to *a defect at that point?* It is true, in the case of Sipple v. Laclede Gas Light Company, 125 Mo. App. 81, 90, it is held that where a *break has been shown,* then, in the *absence of any intervening agency negativing* the idea of negligence on the part of the gas company, such proof is sufficient to sustain an inference of negligence by the jury, the true rule being that the jury might from those circumstances find negligence. But, if the petition in the case at bar be rightfully construed as charging a defect in the main *at the basement,* then, since the evidence shows *no defect there* and the excluded evidence shows that the break was in fact elsewhere and that such break elsewhere was caused by an *intervening agency,* then there is no evidence in the record from which the jury could infer negligence as to the *defect pleaded.* So that, under the petition as construed by the trial court, and the evidence admitted thereunder, the present case is wholly unlike the Sipple case, and the rule therein stated cannot be applied here. As stated, we have no quarrel with that rule when confined, as it is there, to a situation where the defect pleaded has been proven and no intervening agency to cause the defect has been shown. That these two things are necessary to the application of the rule is shown in the case cited in support of it, namely, Carmody v. Boston Gas Light Co., 162 Mass. 539, for there, because of evidence on the part of defendant that the pipe was in good condition but was broken by an intervening agency (a drain dug without notice to the gas company), the trial court refused to instruct that "the fact that gas escaped was prima-facie evidence of some neglect," and upon a verdict being returned for defendant, the plaintiff appealed complaining of such refusal. The ruling was sustained by the Supreme Court, because of the fact that there was evidence that the pipe was in good condition and that the break was caused by an intervening agency. The court at page

541 said that such an instruction in the case of Smith v. Boston Gas Light Company, 129 Mass. 318, could not be said to be wrong "as applied to the facts of that case." And in said Smith case, a "crack in the pipe" was shown with *no* intervening agency to cause it. The court, on page 321 of the Smith case, say: "The escape of gas from a *defective* pipe into the room occupied by the plaintiff, *with no explanation of the cause,* other than was here offered, was some evidence of neglect" and further on, at the same page, the court say the case is not like Hutchinson v. Boston Gas Light Co., 122 Mass. 219, in that the injury, to the pipes in that case was "produced by other causes."

As a matter of fact, in every case to which our attention has been called, as said in Woodburn v. Union Light, etc., Co., 164 Ky. 29, l. c. 32, "there was evidence of a *defect* in the pipes or mains or some part of the equipment which the gas company was under duty of maintaining or repairing, *or* there was *evidence of negligence* on the part of the company." (Italics ours). The case of Paden v. Van Blarcom, 181 Mo. 117, comes within the last branch of the statement just quoted, for there the servant of the gas company, *testing* a gas stove or range, turned the gas on and lighted it without seeing whether the valves in the stove were open, when *it was his duty to know they were closed.* And a careful examination of the other cases hereinafter cited will disclose that they come within one or the other of the two branches of the statement above quoted. Even in the Sipple case there was evidence that the gas company was notified that gas was escaping. In the closing part of the opinion in the Smith case the court says there was some evidence that the pipes were not laid with care. The above quoted statement will also apply to the following cases: Koelsch v. Philadelphia Co., 152 Pa. 355; Kibele v. City of Philadelphia, 105 Pa. St. 41; Kaplan v. Boston Gas Light Co., 177 Mass. 15; Siebrecht v. East River Gas Co., 47 N. Y. Supp. 262; Hashman v. Wyandotte Gas Co., 83 Kan. 328; Rock-

ford Gas Light, etc., Co. v. Ernst, 68 Ill. App. 300; Heh v. Consolidated Gas Company, 201 Pa. St. 443; Consolidated Gas Co. v. Crocker, 82 Md. 113.] In the case last cited the court say, at page 124: "The escape of gas from the defendant's main was under the circumstances stated, *after* it had received notice that gas was escaping into the plaintiff's house, and *after* it had failed or neglected to use reasonable care or proper inspection to discover the location of the leak and to stop it, is some evidence of negligence." (Italics the court's). On the other hand, the following cases have denied a recovery where there was neither proof of a defect in the defendant's pipes nor evidence of negligence on the part of the Gas Company. [Quass v. Milwaukee Gas Light Co., 170 N. W. 942; Hammer Schmidt v. Municipal Gas Co., 99 N. Y. Supp. 890.; Mowers v. Municipal Gas Co., 126 N. Y. Supp. 1033; Morgan v. United Gas Imp. Co., 63 Atl. 417; Lodge v. United Gas Imp. Co., 58 Atl. 925.] [See, also, 14 Am. & Eng. Ency. of Law (2 Ed.), 937; Pouder v. Peoples Natural Gas Co., 93 Atl. 1005; Greed v. Manufacturers Light & Heat Co., 86 Atl. 95; Marshall Window Glass Co. v. Cameron Oil and Gas Co., 59 Atl. 959; Hallon v. Compton Fuel and Light Co., 105 S. W. 426.]

Consequently, upon the theory that plaintiff's petition charged a break or a leak from the main *at the basement,* and in view of the evidence tending to show *no break there* but one at some *other* place, and in view of the fact that plaintiff's *excluded* evidence showed that break was caused not by the negligence of the company but by an intervening agency, it cannot be said, as so urgently insisted by plaintiff, that, under the case pleaded as above assumed, there still remains in the record sufficient evidence to justify a verdict against the defendant on the ground of negligence. Hence the first question hereinabove propounded, as to the sufficiency of the evidence remaining in the record, must be answered in the negative, if the petition is to be construed as the trial court interpreted it. For, upon that

theory, there was no evidence of the defect *pleaded* nor of any negligence on the part of the company *with reference to the pleaded defect.* The presence of gas in the soil around the main at the basement cannot be regarded as evidence of a *leak there* since plaintiff's evidence shows the gas traveled up there from a leak at the excavation; but there was no evidence of any leak down there except the fact that gas escaped there from the intervening agency of blasting and this evidence as to gas escaping at that point was excluded. The plaintiff, in effect though not in express terms, concedes that the evidence as to the escape of gas at the excavation caused by blasting and the evidence that defendant had notice thereof, is necessary in order to justify a verdict, because in the brief, the escape of gas at the excavation, showing a leaky condition in the main there, is included along with the other evidence mentioned as supporting the verdict, And it is urged that even though the court did not permit the evidence showing an escape of gas at the excavation to go to the jury, nevertheless we should consider it in passing upon the question of the demurrer to the evidence. But if the petition charged a break or leak from the main at the basement, then that evidence was *rightfully* excluded, and the question of the defendant's negligence, in respect of the defect charged, must be determined from the evidence remaining in the record bearing upon that and not upon evidence showing a defect not pleaded and defendant's negligence with reference to such unpleaded defect which was excluded. It becomes necessary, therefore, to determine just what the petition does plead in this regard.

We think the petition should be construed as the trial court construed it, namely, as charging a defect at the basement and not somewhere else. It says defendant "negligently and carelessly caused and permitted a large quantity of natural gas to escape *from the gas main,* valve and valve-box, pipes, piping etc.  .  .  . under the east side of Baltimore Avenue aforesaid

*adjacent to the premises* so occupied by the plaintiff and to leak and seep *from defendant's said main,* valve and valve-box, pipes and pipe lines through and into and around the said water pipes, valve, valve-box and fire hydrant and thence through and around said water drain or waste pipe into plaintiff's basement," etc. This certainly means, if it means anything, that the leak, or which is the same thing, the break or defect in the main, was at the basement. "Adjacent" is defined as being near or close at hand; adjoining; bordering. [New Standard Dictionary.] It does not at all times mean abutting but it is usually synonymous with abutting, adjoining and bordering. [In re Bridge Bonds, 128 Pac. 681.] It means contiguous, adjoining, lying close at hand, near. Its precise and exact meaning, however, is "determinable principally by the context in which it is used and the facts of each particular case or by the subject-matter to which it is applied." [1 Corp. Juris., 1196.] The term is a relative one and hence is necessarily governed by the nature and circumstances of that to which it is applied. For instance, Kansas City, Kansas, is adjacent to Kansas City, Missouri, and, in comparison with New York or London, Independence is also adjacent or near to Kansas City. But in a closely built center like the one involved in this case would the northwest corner of 13th and Baltimore, although only 125 feet away, be regarded as "adjacent" to a basement near the southeast corner of 12th and Baltimore? We think not. Again, the whole context of the petition locates the break or leak in the main and pipes at the basement; and the course of the gas seeping from the main, along the cross service pipes through the porous soil, to and into said basement, is traced with minute particularity and nothing is said about any gas traveling up alongside the main from some point elsewhere on Baltimore Avenue. It would seem that, if the pleader had intended to charge generally a leak at any place along the main other than at the basement, the course of the gas therefrom would

have been set forth with the same minute particularity.

For these reasons we are of the opinion that the trial court rightfully construed the petition as charging a defect or leak from the main at the basement; and as there is no evidence of such a defect there and no evidence of defendant's negligence except in connection with a leak not pleaded, the plaintiff is not entitled to call to its aid the evidence of an escape of gas elsewhere and of defendant's knowledge thereof, in order to have a foundation for an inference of negligence with regard to the pleaded defect. In other words, taking into consideration all of the evidence, that excluded as well as that admitted, plaintiff would have a case for the jury had it pleaded a charge broad enough to cover all of that evidence, but having based its case upon the narrower charge of a defect at the basement and of negligence upon the part of the company with reference to the defect at that place, and it appearing that there was no defect there nor negligence with regard to that point but rather that the break, if any, was at some other place and no inference of negligence on the part of defendant arises except upon evidence that was excluded because not within the petition, the plaintiff did not, under the petition and the evidence admitted thereunder, make out a case of liability against the defendant. Of course the case must be made by the evidence which was admitted and which is within the limits of the petition, or else the verdict cannot stand.

The plaintiff contends that the court ought not to have excluded the evidence mentioned because it was admissible against defendant even in a suit for loss on account of an explosion as far away as plaintiff's basement, since defendant knew, and is bound to know, that the dangerous commodity it was handling might, upon escaping at the excavation, travel under ground and cause damage much farther away than that. No doubt it would have been admissible had plaintiff seen fit to plead a case broad enough for that. But it did not, and

the court was right in excluding evidence as to negligence with regard to a defect not pleaded. Plaintiff's contention in this regard is really a contention that the petition was broad enough to cover the excluded evidence. The question is, under the case as made by the petition and under the evidence admitted as being within it, was there sufficient foundation for the jury's verdict when, upon plaintiff's own showing, the pleaded defect was not shown and no inference of negligence with reference to that defect was shown, nor can an inference of any negligence be raised except from something that was not pleaded? We do not think there was sufficient evidence in the record as it now stands, and hence upon the case pleaded and the evidence admitted the verdict lacks the necessary element of defendant's negligence to support it. This calls for a reversal of the judgment, but not for a reversal outright since, upon a remand, the plaintiff can amend its petition so as to justify the admission of all the evidence, which, if believed by the jury and found by them to be more reasonably and probably the cause of the explosion rather than an escape of gas through causes for which defendant would not be liable, will as we have said, support a finding of negligence and of consequent liability against the defendant.

Defendant urges that plaintiff was guilty of contributory negligence as a matter of law in installing and using the booster pump. We do not think so. So far as the installation of the pump was concerned and the consequent connecting thereof with the service pipe, the evidence is that no leaks were there, hence the installation of the pump was not the cause of the leaking of gas. At the time of the explosion there was no ordinance making the use of a pump unlawful. The evidence is that many of such pumps were in use throughout the city and were rendered necessary on account of the insufficient flow of gas at times. The installation and equipment of the switch was shown to be of approved form, hence there was no defect in it. The

gas company knew of such pumps being used and while not issuing any permits for their use, made no objection thereto. The question whether the gas that caused the explosion was pumped into the basement through some vent made in the pipes in the basement or through some open cock or valve on the many burners of the range is a jury question which, as we have already shown, could, under the evidence, be found against the company in view of the evidence justifying a reasonable inference that the explosion did not occur from gas getting into the office room in that way.

Some question is raised over the instructions but they need not be noticed. The judgment is reversed and the cause is remanded for a new trial. All concur.