Blanche Hanson, Respondent, v. City Light & Traction Co., Appellant.—178 S. W. (2d) 805.

Kansas City Court of Appeals. January 10, 1944.

184

*Frank M. Brady* and *Lamm & Barnett* for appellant.

186

*Palmer & Palmer* and *George H. Miller* for respondent.

BOYER, C.—This is an appeal from a judgment in favor of plaintiff. The amended petition upon which the case was tried sought recovery of damages for alleged injuries to plaintiff's health said to have been caused by the carelessness and negligence of the defendant,

its servants and employees, in the installation of a gas furnace in her home together with pipes and appliances connected thereto, and other gas appliances for the use of natural gas furnished by the defendant. It was further alleged, among other things, that the installation was such that gas and gas fumes escaped from the house system and as a consequence thereof plaintiff inhaled said natural gas and gas fumes and was injured thereby. Defendant regarded the petition as charging negligence generally, and moved unsuccessfully to require plaintiff to make the petition more definite and certain and to plead specifically the negligence relied upon. Appellant also asserts in its statement of the case here that the amended petition is predicated upon allegations of general negligence.

The answer of defendant admitted its corporate existence, but denied each and every other allegation of the amended petition.

The record of the proceedings in the trial court is set forth in 1236 pages of the abstract filed here. Plaintiff obtained judgment for $1750, and defendant duly appealed. There are numerous assignments of error made by appellant, but points developed in its brief and argument have particular reference to the action of the court in (1) overruling defendant's motion to have the petition made more definite and certain by pleading specific negligence; (2) the admission of prejudicial evidence; (3) the ruling on the demurrer to the evidence; and (4) the giving of the instruction.

The first point may be disposed of briefly by the statement that defendant waived the defect, if any, in the petition by answering over after its motion to make the petition more definite and certain was overruled. [Grindstaff v. Goldberg Structural Steel Co., 328 Mo. 72, 40 S. W. (2d) 702.]

The case was tried and submitted to the jury upon the theory of general negligence. One of the instructions given on behalf of plaintiff is No. 4, and reads as follows:

"You are instructed that, in this case, plaintiff is not required to show particularly what the specific act of negligence was, if any, which allowed the escape of natural gas or gas fumes, if any, but are only required to show that said escape of natural gas or gas fumes, if any, would ordinarily not have occurred had due care been employed. The burden of proceeding then shifts to the defendant, City Light & Traction Company, to show its freedom from negligence."

Appellant urges various reasons why this was error and why the demurrer to the evidence should have been sustained. Instruction 4 is the hub of the controversy. It is appellant's contention that plaintiff did not make a case under Missouri law applicable to gas; that plaintiff was not entitled to the benefit of the rule of evidence known as res ipsa loquitur, and to apply such rule would be an unwarranted extension of it under the law. It is said that the amount involved is not large but, from the standpoint of the rule in gas cases in Mis-

souri, this case is of great importance, and attention is invoked to all of the evidence. After seining the flood, chin deep, for admitted and controverted facts, and for all proof favorable to plaintiff it appears that there is substantial evidence to show the following:

Plaintiff was a dressmaker by occupation and was about forty-seven years of age at the time of the trial which began in June, 1942. She lived with her husband, father and sister in house No. 1900 Harrison Street in the City of Sedalia since 1932, and that was where she pursued her occupation and suffered the injuries of which she complained. The defendant was engaged in furnishing odorized natural gas to the public as a part of its business and supplied such gas for use in the house where plaintiff lived. The house contained eight rooms, four below and four upstairs. Plaintiff and her husband occupied the downstairs rooms and her sister and father occupied the upstairs. There were two separate meters to measure the gas. The appliances for the use of gas upstairs consisted of radiant heaters and a kitchen range, and the appliances downstairs consisted of what is known as circulating gas heaters and a range, some of which were obtained from the defendant and installed by defendant. Certain other appliances had been purchased from individual merchants and were installed by others than the defendant.

Thus equipped the plaintiff and others in the household used natural gas furnished by defendant from 1934 to about November 18, 1940. The service and use of the gas had been entirely satisfactory and no inconvenience or difficulty had been experienced. On or about the last-named date after conferences with salesmen representing the defendant, plaintiff and the defendant entered into a contract whereby it was agreed that plaintiff would purchase and that defendant would install what is known and described as a gas floor furnace to furnish heat and to replace the gas circulators then in use for that purpose. Plaintiff made a down payment on the gas floor furnace and defendant, through its agents, determined the number of units of the gas furnace to be installed and separate locations for said units at three different places in the downstairs apartment. Defendant assumed charge of the rearrangement and through its workmen prepared the locations in the floor for the gas units, removed the gas circulators that were then attached, installed the units of the gas floor heater; rearranged the gas pipe system, installed and relocated new gas pipe to the kitchen range, and supplied other new pipe of its own and connected the gas units with two leads of pipe to each unit, one for the pilot light and one to carry the gas to be consumed. A gas regulator was also attached and a thermostat was put in use. There was also some rearrangement of heating equipment for the upstairs. The installation was completed November 22, 1940, and the equipment was put in use.

The next day plaintiff first noticed the odor of gas. She did nothing about it. It was a faint odor of gas. It also smelled like burning oil. She was not alarmed and thought it might have been the "burning off of the new appliances." During the next day which was Sunday, November 24, she felt rather ill and did not know just what was the matter. She spent part of the day upstairs with her sister and then went back to her own apartment and felt ill. From November 24 to November 29, plaintiff's illness and difficulties increased and she described her symptoms as affecting her eyes and tightness in the temples and across the forehead. There was a nauseating odor of gas and gas fumes in the house. She became weak in her knees, lost appetite, could not swallow food, got dizzy and nervous, had pains in her back, intestines and severe headache; "it seemed the top of my head was pushing off"; she felt a smothering, was unable to breathe, and went outdoors to get air; her heart raced severely; she was then alarmed and called the company. The company's service men came to the house on November 29, and after investigation reported to plaintiff that they had found a brick in the flue that obstructed the vent pipe; that they had cleaned it out and taken care of the condition, and informed plaintiff that the brick had caused fumes to back in under the house. The service order ticket in the hands of the service men directed: "Check floor furnace for fumes," and their report of trouble found and how corrected was: "Flue stopped up. Cleaned out by Self." Mr. Self was one of the service men. That evening plaintiff and her husband opened all doors and windows, turned off the furnace and left the house for a visit. When they returned the house smelled clean and they went to bed without any more heat that night. The following day, November 30, plaintiff's difficulties continued and her heart raced and she felt weak and shaky. She complained about the gas and called the defendant again. Three men were sent out. Some of them went under the house and made an investigation and when asked what had happened, one of the men said "I don't know." Another explained that "the longer that brick stayed in the flue, the fumes would accumulate in under the house and push up into the house." The difficulty did not subside and on December 2, plaintiff again reported it to the company but no one came that day. On December 3, she called again and was promised that the engineer would come out, but he did not appear until December 4. At this time plaintiff could "hardly breathe." The engineer went to the basement, stayed a few minutes, and then reported to plaintiff: "I am sorry, we will remove the furnace." That afternoon, December 4, the use of the gas floor furnace was discontinued. It was disconnected and removed by defendant's employees who had complete control over the matter and they replaced plaintiff's old circulating heaters.

The testimony of defendant's witnesses who did the work shows that they not only removed the furnace but removed the pipe that they had put in as the property of the company and rearranged and reconnected the piping of the circulating heaters. According to plaintiff's testimony it was the understanding that if the gas floor furnace did not give satisfaction it would be removed and that her house would be put back exactly as they found it, and that is what she asked to be done. Plaintiff said she had no supervision over the work. After the circulating heaters were reinstalled, conditions did not improve; a strong, nauseating odor continued to stay in the house; the windows and doors were kept open most of the time, and that was the only way she could live in the house. Plaintiff notified the company repeatedly of the situation. She obtained no answer to her complaints in regard to the gas circulators for some time. On one occasion a representative of the company came out and said: "We are responsible for the furnace, but we are not responsible for the circulators."

About December 12, the superintendent of the company's gas department, with another, appeared and went through the house and in the basement. Plaintiff was complaining of the odor of gas and a strong nauseating odor. The superintendent denied that there was any gas in the house and attributed the difficulty to dust or sewer gas. Plaintiff became desperately ill and decided to dispense with the use of gas entirely and so notified the company. On December 16, the company removed the meters and plugged the service gas pipe in the basement. Plaintiff requested the company to remove that pipe and cut off the gas at the street and this was done. According to plaintiff on December 28, but according to defendant on December 23, and on the day the gas was cut off at the street curb, the manager of the company's department and another man appeared with a gas detector. The parties were in the house and investigations were made with the detector, but this was after the meters had been removed, and that was when plaintiff was informed it was sewer gas or gas from an old cistern.

In reference to the proper method of testing a house pipe system for gas leaks, plaintiff called a master plumber of forty years' experience in the installation of gas appliances and testing for gas leaks in gas systems. He testified that he had made thousands of tests finding gas leaks in appliances and house piping; that the instrument with which to find leaks and to test pipes was a mercury column on a gauge. He described its use and said that such method is considered absolutely accurate by all authorities and that it is the only positive system at all for finding a leak on a gas job. Defendant's gas service men testified in reference to the methods used by them to test the gas pipes and equipment to ascertain whether or not there was a leak. The only methods used by them were what is known as the soap test,

consisting of the application of a thick lather around the joints that would show bubbles if a leak existed, and the test that the meter would show. There is no evidence that any other method or appliance was used except the gas detector which was not attempted to be used until at least one week after the use of gas in the house ceased.

The use of gas was discontinued December 16. Plaintiff had arranged to have a hot air coal furnace installed by the Holland Furnace Company and it was necessary to make excavations to extend the size of the basement and preparatory work was begun on that day. A Mr. Benn, representing the furnace company, arrived at the house on December 16 about nine or ten o'clock to install a heating appliance to take the place of the gas circulators. The gas had not yet been shut off. Mr. Hanson or Mr. Benn cut off the gas at the meters and Mr. Benn disconnected the gas circulators and some of the gas pipes and plugged the range pipe while installing the heater which he had brought. Two or three hours thereafter the company's men removed the meters and plugged the service gas pipe. Some days thereafter, Mr. Benn said he removed some of the gas pipe that was in the way of the cold air returns for the furnace, and that he "didn't need a wrench to take most of them apart," but took them apart with his hands. In taking the pipes out he found a T joint attached to one of them with one end open. It was a three-fourths inch pipe and T. Mr. Benn also said that when he first entered the house he ascertained the presence of gas in the house and that no one need tell him about it. A number of other witnesses, including the members of the household, a neighbor and a household employee, shown to be familiar with the odor of natural gas, all testified to the presence of gas and gas fumes in the house while the gas furnace and the gas circulators were in use and of the ill-effects upon them and plaintiff by inhaling it. An independent plumber had been called to plaintiff's house during the trouble. He was called as a witness by defendant and in the course of his examination said that he was in the house only about three minutes, but he could smell some fumes from the gas and he could feel the fumes in his eyes. Plaintiff and other witnesses of the household testified that gas and gas fumes had so permeated the house that the disagreeable condition continued for a long period after the gas furnace and circulators were removed. It was shown that all members of the household were made ill and were affected in varying degrees and eventually, upon advice, the house was abandoned by all members of the family except Mr. Henson, and that the condition of the ones who left the house improved thereafter.

It was shown that prior to the installation of the gas furnace plaintiff was conducting a prosperous business; that she was of normal good health and worked long hours, not only during the day but until nine or ten o'clock at night; that after her experience with the gas

furnace she became severely ill and was able to do but little work and lost a great part of her business.

Plaintiff testified that the day after the gas furnace was removed she had a conversation with defendant's sales manager at the office and that he said to her: "We have a definite record that the floor furnace has affected your health." This was denied by the person in question. With reference to plaintiff's ailments which she attributed to the condition in her house, she said she consulted a physician who was then treating her father and was advised to take nerve tonic and other medicine for her gall bladder, and that the doctor told her that gas thinned down her blood, and that gas poisoning was causing the gall bladder trouble. The doctor referred to testified for defendant and said he had no record and no recollection of any such statements made to plaintiff.

There was much medical testimony but it furnished little light as to the cause of plaintiff's sickness and ailments in November and December, 1940. Plaintiff called two physicians, one of whom had been appointed by the court to examine her. One doctor examined her June 8, 1942, and the other on June 11, 1942, and their testimony pertained largely to the condition of plaintiff at that time. Some abnormalities were found. Plaintiff was extremely nervous, showed exaggerated knee reflexes, a fast heart, rales in the right lung, and increased temperature. These doctors did not profess to know the cause of her condition. They had not treated gas cases, but one of them said that the inhalation of natural gas in his opinion could cause gall bladder trouble and that fumes from various things would cause rales.

Three doctors examined plaintiff on June 23, 1941. Two of them testified, and one was the regular physician who examined and treated injured employees of the defendant. The trend of their testimony was that all of plaintiff's symptoms were subjective, which they attribute to gall bladder trouble or menopause, and they found none which they could attribute to the inhalation of natural gas. One of them said, however, that the presence of gas would aggravate her symptoms. One of them said in answer to a hypothetical question propounded by defendant's counsel that there was nothing to indicate that gas was the cause of plaintiff's symptoms, but in answer to a question by plaintiff's counsel said, "the way you frame your question it might be due to natural gas," and that if plaintiff had been suffocated six months before it would not show at the time of examination. While defendant's witnesses attributed many kinds of symptoms to menopause, there is other ample medical evidence that such symptoms may or may not follow and that there is no general rule that could be applied. Plaintiff claimed that menopause had occurred practically two years before her examination, and that she had completely passed through the change. There was an abundance

of medical testimony that inhaling natural gas in sufficient quantity would not only produce dizziness but also coma and death. Further reference to the evidence will be made in connection with the consideration of the different points in the case. A detailed resume of the testimony of each witness is neither practical nor necessary. The foregoing is considered sufficient for a consideration of the prime questions of the applicability of res ipsa loquitur, and the ruling of the court upon the demurrer.

As a preliminary to these main questions and as a basis for appellant's position that res ipsa loquitur is not applicable, and that plaintiff failed to prove any negligence on the part of defendant and a causal relationship between such negligence and the alleged injuries, there is a prolonged and learned discussion and the citation of authorities upon the proposition that plaintiff offered evidence of specific negligence, and under the pleading and proof the case could not be submitted to the jury upon general negligence. The evidence of specific negligence referred to is the testimony of witness Benn who said he discovered an open T pipe. This discovery was made many days after the service of gas had been suspended and defendant had removed its pipe and equipment from the premises. While under the evidence an inference might be drawn that the open end of the T was at one time used for connection of the pipe to the kitchen range, still there is no proof as to when, if ever, the gas pipe to which the open T was attached was used in that condition as a part of the house gas system. It is not at all probable that gas could have been furnished through a pipe system that contained an open T of that size and reach the equipment in the house, and there is evidence in the case to that effect. In reference to this point, appellant relies upon the law as declared in Palmer v. Brooks et al. (Mo.), 169 S. W. (2d) 906, and other cases cited therein. It is said in the opinion, l. c. 909:

"In cases which might otherwise be submitted under the res ipsa rule, if the plaintiff's evidence discloses the particular negligence giving rise to the cause, then the cause cannot be submitted under the rule."

There can be no doubt that such is the law. Neither is there any doubt of a related rule of law just as firmly established, "that even though the plaintiff introduce evidence tending to show specifically the cause of the accident, the benefit of the rule res ipsa loquitur will not be waived or lost if by this evidence the cause is still left in doubt or is not clearly shown." The above quotation is from Conduitt v. Trenton Gas & Electric Co., 336 Mo. 133, 31 S. W. (2d) l. c. 25, an authority cited by appellant, and the rule as there declared has been repeatedly announced by the Supreme Court in other cases. [Price v. Metropolitan Street Ry. Co., 220 Mo. 435, 119 S. W. 932; Glasco Electric Co. v. Union Electrict Light & Power Co., 332 Mo.

1079, 61 S. W. (2d) 955; Timmons v. St. Louis-San Francisco Ry. Co., 231 Mo. App. 421, 100 S. W. (2d) 952.] The exact cause of the escape of gas was not shown by plaintiff's evidence and she was not deprived of the right to go to the jury on general negligence by the evidence of witness Benn as presented in this case.

Appellant next dwells extensively upon the distinction between the responsibility of a gas company for leaks in its own property and leaks in a house system, and urges that the established rule is that, "ordinarily a gas company is under no duty or obligation to inspect pipes and appliances in a house which do not belong to it and is not ordinarily liable for injuries which may have resulted from a defect in the house pipes or appliances, unless some causal connection is shown between some proven defect and some negligence of the gas company." [Citing Chouteau v. St. Louis Gas Light Co., 47 Mo. App. 326, 329; Laclede Gas Light Co. v. Gas Consumers Assn., 127 Mo. App. 442, 106 S. W. 91, and a number of cases from other jurisdictions.]

Respondent does not question the general rule of law thus broadly stated and its *ordinary* application to the relief of a gas company of responsibility for the condition of gas pipes and appliances on private property; but insists that it does not apply to all cases and is subject to well defined exceptions depending upon the facts and circumstances shown in evidence; the duty of the company arising from the relationship of the parties; and the obligation assumed by defendant, such as that developed by the proof in the instant case.

It is plain enough in reason, and by the great weight of authority, that the rule is, and ought to be, that a gas company is not relieved of all duty and responsibility after notice that gas which it furnishes is escaping from appliances and pipes on private property. Notice changes the usual rule of responsibility of the respective parties and the ordinary rule does not apply. There is no denial of the many notices of escaping gas and gas fumes in the instant case. Defendant responded to most of the notices and assumed the duty and responsibility of inspection and correction of any defects that might exist. Its efforts were ineffective to stop the escape of gas, according to plaintiff's evidence, but defendant nevertheless continued to supply the gas notwithstanding the many complaints that it was escaping in the house. Under such a situation it was the duty of the company to find the leak and stop it, or, in the event that it was not found and complaints continued, to shut off the gas to the premises until plaintiff made the required adjustments for the safe use of the commodity. A reasonable regard for human safety would require such precautionary measures. [38 C. J. S., p. 735, sec. 42 d; 12 R. C. L., p. 909, par. 49; 138 A. L. R., pages 883 to 892, inclusive.]

The pending case appears to be *sui generis* upon the facts so far as Missouri adjudications show, but there are a number of cases from

other jurisdictions cited in the foregoing compilations that are closely analogous upon the facts, and in which the liability of the company was upheld. [Heller v. Equitable Gas Co., 333 Pa. 433, 438, 3 A. (2d) 343; Julian v. Sinclair Oil & Gas Co., 168 Okla. 192, 32 P. (2d) 31; Scarborough v. Central Arizona Light & Power Co., 117 P. (2d) 487; Northwest States Utility Co. v. Brouilette, 51 Wyo. 132, 65 P. (2d) 223; Miller v. Wichita Gas Co., 139 Kan. 729, 33 P. (2d) 130; Baker v. Kansas Power & Light Co., 146 Kan. 258, 69 P. (2d) 731; Mississippi Power & Light Co. v. McCormick, 175 Miss. 337, 166 So. 534; Sutcliffe v. Fort Dodge Gas & Electric Co., 218 Iowa, 1386, 257 N. W. 406; Fonda v. Northwestern Public Service Co., 138 Neb. 262, 292 N. W. 712.] Under the facts in this case defendant was not relieved from responsibility for the condition of the gas pipes and appliances in plaintiff's house.

Following the foregoing, appellant next urges that *res ipsa loquitur* does not apply under the evidence in the case because it was shown that other persons than the defendant during the time in question manipulated the appliances and gas pipes and that defendant did not have exclusive control and management thereof as an essential element for the application of the *res ipsa* rule. The manipulations of appliances relied upon by appellant are these: That the occupants of the house used said appliances; that on one occasion plaintiff's sister desired to shut off the pilot light to the range in her kitchen upstairs; she was almost blind and could not see sufficiently to do that herself and called her sister, plaintiff, to do it for her; plaintiff responded and in attempting to adjust the pilot light a screw dropped out in her hand and permitted a flame to be created from the pilot pipe; the company was called and sent a service man who, at the request of plaintiff's sister, removed the pilot light fixture entirely and plugged it up. That was what she desired because she could not keep the pilot light burning with the windows open. This occurred on December 14, 1940, according to plaintiff's testimony. The only other manipulation of any kind by any other person was that performed by Mr. Benn who began work on moving some gas pipes on December 16, the very day the company removed its meters and shut off the gas. Such manipulation is not regarded sufficient to constitute a material interference with the management and control of the gas pipe system in plaintiff's house by the defendant from November 18 to December 16. There is a significant distinction in this case upon the facts in reference to the relationship of the parties and the management and control accorded to the defendant and which the defendant assumed and exercised. The defendant adopted its own plan and its own method of procedure in installing the gas furnace in plaintiff's house, rearranged the gas pipes, supplied new pipes, completed the job with assurance of safety, and turned on the gas. When complaints came in it assumed the obligation of testing the pipes and

appliances, and according to the evidence in behalf of plaintiff no adequate and dependable test for a gas leak in the pipe system was ever used, and according to defendant's evidence no gas detector was ever on the premises until seven days, at least, after the gas had been cut off.

Appellant cites and relies upon many cases for support of its position that *res ipsa loquitur* is not applicable in this case; that under the evidence there is no place for presumed negligence; and that plaintiff was required to prove negligence on the part of defendant and a causal relationship between such negligence and the alleged injuries. Cases referred to and analyzed in the argument upon which special reliance is placed are: Brown v. St. Louis County Gas Co. (Mo. App.), 131 S. W. (2d) 354; Gibbs v. General Motors Corp. (Mo.), 166 S. W. (2d) 575; Taylor v. Missouri Natural Gas Co. (Mo. App.), 67 S. W. (2d) 107; Streck v. St. Louis County Gas Co. (Mo. App.), 58 S. W. (2d) 487; Nomath Hotel Co. v. Kansas City Gas Co., 204 Mo. App. 214, 223 S. W. 975; Rade v. St. Louis County Gas Co. (Mo. App.), 254 S. W. 415; Bonner v. Texas Company, 89 F. (2d) 240; Schaum v. Equitable Gas Light Co., 15 App. Div. 74, 44 N. Y. Supp. 284. None of said cases shows a state of facts similar to that revealed by the evidence in the pending case, and all are distinguishable for that reason as well as others that may be pointed out.

Appellant contends that the case of Brown v. St. Louis County Gas Company, *supra,* is squarely in point. Upon examination it is not found to be so. In that case plaintiff sought damages by reason of freezing and bursting of pipes and radiators of a hot water heating system while plaintiff and her family were absent from home. The damage occurred, according to the statement of the court, ''when the supply of gas to the burner in the basement became entirely shut off due to the fact that the mechanical equipment which controlled the intake of gas failed to function as it was designed to do.'' The mechanical equipment referred to was a solenoid valve. There was electrical connection between it and the thermostat. Instead of draining the water system to prevent freezing, plaintiff and her husband accepted the advice of one of defendant's agents that it would not be necessary to do so and that one of defendant's men would adjust the apparatus necessary to maintain a temperature of fifty degrees Fahrenheit in the house while the family was away. The proposal was accepted and certain adjustments were made. There was evidence that during the absence of plaintiff the mechanical equipment mentioned permitted the flow of gas for several days, but finally failed to function and as a result prevented a sufficient supply of gas to the heater. There was a freeze-up and damage resulted. There was no showing that the defendant furnished or installed the mechanical equipment referred to or had any responsibility whatever

for its proper functioning, or that it had any notice that such equipment would not function properly. The inference is that such equipment, the gas pipes, and all other appliances in the house were installed by, and were at all times under the complete control of, the owner, and never at any time in the exclusive possession, management and control of the defendant. Mainly for this reason the court ruled that under the facts in that case all the essential conditions for the application of *res ipsa loquitur* were not shown. The defendant did not have control, or the right of control, at the time of the occurrence which was claimed to be due to the negligence of defendant. In the pending case defendant not only installed and rearranged all the appliances and gas pipes that were put in use, but had complete supervision thereof, and the right of control for inspection and correction at the express instance of the plaintiff. A number of the other authorities cited present explosion cases under a variety of facts and circumstances such as to require proof of some particular negligence of the defendant and that said negligence caused the damage. In others, specific negligence was alleged. No controlling authority is cited that sustains appellant's contention that this is not a *res ipsa* case.

The conclusion is that under the petition and evidence plaintiff was entitled to rely upon presumptive negligence under the rule of *res ipsa loquitur*, and there was no error in giving Instruction No. 4, and other instructions, submitting the case upon general negligence. There was substantial proof from which negligence could be found without resorting to conjecture.

Appellant claims that the weight of the evidence shows that plaintiff's ailments and physical complaints were caused by gall bladder trouble and menopause rather than by the inhalation of natural gas; that the evidence shows more than one means by which natural gas could have gotten into the house, and that under such circumstances the rule applies that where plaintiff's injuries may have resulted from two or more causes plaintiff must have substantial evidence tending to show the cause for which defendant would be liable was the actual cause of the damage; that there is no substantial evidence that defendant caused natural gas to get into the house and that natural gas caused plaintiff's illness and complaints. The evidence set out above answers these contentions. The source of plaintiff's illness and symptoms thereafter was a question of fact properly submissible to the jury under conflicting evidence. There is no substantial proof that natural gas was released in plaintiff's house from any other source than the gas pipes and appliances installed by the defendant. There was substantial evidence from which the jury could find that the cause of plaintiff's injury was attributable to some negligence of the defendant and that was sufficient. [Cole v. Uhlmann Grain Co. (Mo.), 100 S. W. (2d) 311; State ex rel. City of St. Charles v.

Haid, 325 Mo. 107, 28 S. W. (2d) 97; Guthrie v. City of St. Charles, 347 Mo. 1175, 1188, 152 S. W. (2d) 91.] The function of weighing the evidence rests with the jury and not with the appellate court in a case of this character. [Vaughn v. Kansas City Gas Co., 159 S. W. (2d) 690.]

The erroneous admission of evidence is the remaining point for consideration. Over the objection of defendant the court permitted one of plaintiff's witnesses to testify to some extent to the nature and effect of carbon monoxide gas. It was shown that carbon monoxide is a very poisonous gas produced by improper mixture of oxygen and natural gas in its burning, and that a very small percentage of it in a room would be sufficient to produce nausea, headache, dizziness and other symptoms of carbon monoxide poisoning. On cross-examination of this witness, defendant's counsel developed the fact that the doctor then testifying did not find any such symptoms in the plaintiff as he had been talking about. There was no reference in the petition to carbon monoxide gas and there had been on evidence indicating the presence of carbon monoxide gas in plaintiff's house. Under such conditions, in admitting the evidence, the court said: "I am admitting this testimony here just on the assumption that it might be hooked up, but if it isn't, I will certainly instruct the jury very positively to pay no attention to it." There was no sufficient connection of carbon monoxide with the case, and at the close of the evidence the court instructed the jury as follows:

"The jury are instructed that while some expert testimony has been given concerning the nature and effects of carbon monoxide gas, that there is no evidence in this case of the presence of carbon monoxide gas at any time in the premises mentioned in the evidence, and no evidence whatever that the plaintiff has been in any manner or to any degree affected by carbon monoxide and any evidence concerning said gas is withdrawn from your consideration and you shall not permit such evidence to influence your verdict or deliberations in this case in any manner whatsoever."

The evidence referred to should not have been admitted and the court very properly withdrew it from consideration of the jury. Appellant contends that the withdrawal instruction was ineffective to repair the damage done and to remove the "poison" from the minds of the jury.

An instruction of the court to the jury to disregard evidence erroneously admitted is ordinarily sufficient. The favorite quotation on the subject is lifted from Harrison v. Kansas City Electric Light Co., 195 Mo. 606, 635, where it is said:

"To hold otherwise would be to establish the rule of practice that when a court made a mistake and admitted incompetent testimony, and afterwards discovered that it had done so, it could not effectually correct the error by instruction to the jury, but that in order to re-

move the sting of the error it would have to discharge the jury and award a new trial before a new venire. Such a rule could not reasonably be expected to be announced by any court.. When a trial court becomes satisfied that it has erred in the admission of testimony, all that it can do is to instruct the jury to disregard it, and the presumption is that the jury did disregard it.''

The above statement was adopted in Evans v. Missouri Pacific Railroad Co., 342 Mo. 420, 426, 116 S. W. (2d) 8, and in Grott v. Johnson, Stephens & Shinkle Shoe Co., 2 S. W. (2d) 785, 788.

Of course, there are. exceptions to the general rule such as shown in National Cash Register Co. v. Kay (Mo. App.), 119 S. W. (2d) 437; Chenoweth v. Sutherland, 141 Mo. App. 272; Meyer v. Lewis, 43 Mo. App. 417; and Mueller v. Weitz, 56 Mo. App. 36, cited by appellant. The general rule and the exceptions are set forth in 5 C. J. S. beginning on page 1031 with section 1737b. The statement is made that the general rule applies ''especially where there is no motion for a mistrial.'' Defendant merely offered its various objections to the evidence, but evidently did not regard its admission sufficiently injurious to move for a mistrial at that time, and no such motion was made. Under the circumstances shown by the record the trial judge was in the best position to determine the injurious effect of the testimony and whether it was beyond the reach of the instruction given.

The verdict in this case was for a moderate amount, and certainly it does not indicate that the jury was unduly inflamed or prejudiced by anything that occurred in the trial. The circumstances shown in the record are not of such prejudicial character as to call for a reversal of the judgment as the only cure. The court was tolerant and liberal with both defendant and plaintiff during a long and tedious procedure. We are of opinion that defendant had a fair trial.

The conclusion upon the whole case is that no reversible error has been shown and the judgment should be affirmed. The Commissioner so recommends. *Sperry C.*, concurs.

PER CURIAM:—The foregoing opinion of BOYER, C., is adopted as the opinion of the court. The judgment is affirmed. *Bland* and *Cave, JJ.*, concur; *Shain, P. J.*, not sitting.