RICHARD STEPHENS v. KANSAS CITY GAS COMPANY, Appellant; RICHARD STEPHENS, Appellant, v. METROPOLITAN LIFE INSURANCE COMPANY.—No. 39394.—191 S. W. (2d) 601.

Division One, January 7, 1946.

836

*Charles M. Miller* for appellant Kansas City Gas Company.

838

*James R. Sullivan* and *Walter A. Raymond* for respondent Richard Stephens.

*James R. Sullivan* and *Walter A. Raymond* for appellant Richard Stephens.

842

*Clay C. Rogers* and *Mosman, Rogers, Bell & Conrad* for respondent.

 DALTON, C.—Action for $25,000 damages for personal injuries alleged to have been sustained by reason of the negligence of defendants, hereinafter referred to as Gas Company. and Insurance Company. The jury returned a verdict in favor of plaintiff for $8,000 against the Gas Company, but found for the Insurance Company. Judgment was entered on the verdict. Plaintiff and the Gas Company have appealed.

Plaintiff was employed as a porter in a barbershop in the basement of the Grand Avenue Temple Building, a 12 story office building located at Ninth and Grand Avenue in Kansas City. While engaged about his work, plaintiff was injured by an explosion which occurred in a basement of the building. The building was owned and operated by the Insurance Company. The Gas Company, a public utility, owned and operated a gas main in Grand Avenue and furnished natural gas for use in the building.

On its appeal, the Gas Company contends that plaintiff's third amended petition failed to state facts sufficient to constitute a cause of action; that the evidence was insufficient to make a case for the jury; that no lawful verdict was returned; that erroneous evidence was admitted over objection; and that the court erred in the giving and in the refusing of instructions and in instructing the jury that the Gas Company was required to exercise the highest degree of care.

The third amended petition charged "that the defendants, and each of them, had complete charge and control of said building and gas mains and pipes connected therewith and adjacent thereto; that the plaintiff did not have any control thereover; . . . that said explosion was an unusual and extraordinary occurrence, and would not have happened but for the negligence of the defendants; . . . that the negligence of the defendants, and each of them, joined, concurred and combined with the negligence of the others in causing said explosion and in causing plaintiff to suffer serious and permanent injuries." The petition also charged that the Insurance Company "was in full charge and control of said building."

The Gas Company says that the petition contains no direct allegation of general or specific negligence; that the allegations as to control of the building are conflicting, contradictory and self destructive; that the statement with respect to negligence is a mere statement of conclusion and presents no issuable fact; that the petition pleads no causal connection between plaintiff's injuries and gas company's negligence or between the explosion and plaintiff's injuries; and that no cause of action is stated against it under the res ipsa loquitur doctrine or on any other theory. The Gas Company further insists that, since it filed a demurrer to the petition in the trial court, it is entitled to require the plaintiff to state his case under strict rules of pleading and to have the allegations taken more strongly against the pleader.

The Gas Company did not stand upon its demurrer, but answered over and went to trial on the merits. By answering over and going to trial, the Gas Company waived its demurrer to the petition and all defects, except the failure of the petition to state a cause of action and jurisdiction of the subject matter. State ex rel. Kansas City Light & Power Co. v. Trimble (Mo. Sup.), 262 S. W. 357, 359. In determining the sufficiency of the petition after verdict and judgment, we must indulge every reasonable intendment in favor of the petition. Hamilton v. Standard Oil Co. (In Banc), 323 Mo. 531, 19 S. W. (2d) 679, 683. And it is immaterial that defendant may have attacked the petition for the same cause in the court below. National City Bank of St. Louis v. Carleton Dry Goods Co., 334 Mo. 339, 67 S. W. (2d) 69, 71. "A petition does not wholly fail to state a cause of action because of a lack of certainty or a lack of definiteness in allegation, nor for informality in the statement of an essential fact, nor because a cause of action is defectively stated." Baugher v. Gamble Construction Co., 324 Mo. 1233, 26 S. W. (2d) 946, 949. "Such objection is disallowed if by reasonable intendment, or by fair implication from facts stated, or if by most liberal construction the essential allegation may be got at by inference." East St. Louis Ice & Cold Storage Co. v. Kuhlmann, 238 Mo. 685, 702, 142 S. W. 253; State ex rel. Perkins v. Long, 275 Mo. 169, 204 S. W. 914; Sec. 953, R. S. 1939.

"A general charge of negligence, which is predicated on an act of the defendant causing the injury, is good as against the objection that no cause of action is stated, and it is not necessary to state the specific facts showing the negligence in order to state a cause of action." Zichler v. St. Louis Public Service Co., 332 Mo. 902, 59 S. W. (2d) 654, 657. A petition which charges negligence in general terms, without more, is good after verdict and judgment. State ex rel. Brancato v. Trimble, 322 Mo. 318, 18 S. W. (2d) 4; State ex rel. Hopkins v. Daues, 319 Mo. 733, 6 S. W. (2d) 893, 897; Watts v. Moussette, 337 Mo. 533, 85 S. W. (2d) 487, 491.

We need not determine whether the petition stated a cause of action under the res ipsa loquitur doctrine or whether it could have been made more definite and certain on motion. No such issues were presented or ruled. The sole issue presented is whether the petition states a cause of action against the Gas Company. The petition contains a charge of general negligence and further alleges that a gas explosion took place in the building causing him to be knocked down and *causing* falling objects to strike him; that the explosion *would not have happened* but for the negligence of the defendants; that the negligence of the defendants, and each of them, combined with the negligence of the others in *causing* said explosion and in *causing* plaintiff to suffer serious and permanent injuries. The petition sufficiently alleged that the Gas Company was negligent and that the ex-

plosion and plaintiff's injuries were caused thereby. The court did not err in overruling the Gas Company's general demurrer to the petition.

On the issue of demurrer to the evidence we consider only the evidence most favorable to plaintiff and the inferences to be drawn therefrom and disregard the evidence of the defendants unless it aids the plaintiff's case against the Gas Company. The basement of the Grand Avenue Temple Building was partitioned into several rooms, one being occupied by a barbershop, where plaintiff worked. South of the barbershop was a storeroom and dressing room, which we infer were used in connection with the operation of the building. An oil furnace was located in the southeast corner of the basement and an oil supply tank in the southwest corner. The west basement wall extended to the curb line and a sidewalk 15 feet wide and 5 inches thick extended above the west part of the basement. The Gas Company owned and maintained a 4 inch gas main in Grand Avenue on the west of the building and out some 6 feet from the curb line. The street was paved with concrete, with a 3 inch covering of asphalt. The paving was from 9 to 16 inches thick. The gas main was laid in a rock cut in the street and the space above the pipe was back filled with clay and broken rock, some pieces of rock being 4 to 6 inches in diameter. The distance between the top of the gas main and the base of the pavement varied from 9 to 14 inches. A concrete tunnel 4 by 5 feet and 50 feet in length, had been constructed under the basement of the building and extended from west to east, some 35 feet from the south side of the building, underneath the storeroom, dressing room and a hall. A 2 inch gas service pipe entered the basement and connected with a gas meter located inside the west wall. House pipes from the gas meter extended down and entered the tunnel through a 6 inch opening almost directly below the meter. There was a manhole entrance into the tunnel in the same vicinity, but the manhole was covered with a board cover. Another opening into the tunnel was located 35 feet east of the west wall. This opening was covered with a brass plate on the floor of the dressing room. The tunnel contained gas and water pipes and, at the east end connected with a pipe shaft extending up to the top of the building. This pipe shaft housed gas pipes, sewer pipes and water pipes. At the west end of the tunnel, there was an opening 2 feet by 2 feet through the west basement wall and a tunnel or opening in the rock extended out about 10 feet under the pavement in the street. The rock sides of this opening were broken, cracked and seamy. This opening also connected with a void or space 12 to 18 inches wide, between the west wall and the rock formation under the street pavement. The west wall was of stone construction, some 18 inches thick, sealed tight and plastered on the inside of the basement. The heat from the hot water pipes in the pipe shaft at the

east end of the tunnel caused a strong west to east current of air at all times in the concrete tunnel under the basement floor.

About 5:30 P. M. on November 17, 1939, a person dropped a street car token in the dressing room, lit a match and removed the brass plate from the opening into the tunnel. There was a flash of blue flame followed by an explosion which demolished most of the partition walls of the basement, lifted and broke up part of the sidewalk over the west end of the basement, particularly near the gas meter, and otherwise damaged the building. The center of the explosion was a point in the immediate vicinity of the gas meter and above the manhole into the west end of the tunnel, that is, some 35 feet west of where the brass plate was removed. The west wall was not damaged or disturbed by the explosion, except where the sidewalk was lifted off or broken. No gas leaks were found about the gas meter, the 2 inch service pipe or in the gas pipes in the tunnel, even after the explosion. The gas which had passed through the meter in recent months did not exceed the amount which would have been reasonably used by the three gas consumers in the building. The amount of gas metered could not have supplied the gas for the explosion. No explosion had occurred in the tunnel, although there had been fire in the tunnel. The manhole cover was not lifted off at the west end of the tunnel.

After the explosion, gas was smelled at an opening in the sidewalk at street level and above the gas meter location. The 4 inch gas main was found to be broken (entirely severed) at a point some 35 feet south of where the service pipe entered the building, that is, about 42 feet from the center of the explosion. Soil removed from about the break in the gas main was colored as it would have been from long exposure to escaping gas. On the night of the explosion, but before the break was discovered, escaping gas was detected 75-80 feet north of the break and along the 4 inch gas main. Gas is lighter than air and it tends to rise. When confined, it follows the path of least resistance and gas escaping from the broken main under the pavement would have followed the gas main or spread out into the seamy and creviced rock formation about it and would have reached the opening west of the wall and would have entered the tunnel through the opening in the west wall. When it entered the west end of the tunnel, it would have followed the draft to the east. Any gas escaping into the basement through the 6 inch opening below the gas meter, or about the manhole cover at the west end of the tunnel, would have risen to the ceiling in the vicinity of the gas meter. In the opinion of experts, this is what happened. There was evidence that if the percentage of gas in air exceeds 30% it will not burn, but from 13 to 30% will burn, and from 5 to 13% it will explode. To have burned in the tunnel, the percentage of gas in the air had to have been from 13 to 30% and, to have exploded in the vicinity of

the gas meter, the percentage of gas to air had to have been from 5 to 13%. The gas in the tunnel had acted merely as a fuse to set off the explosive mixture above the west end of the tunnel. A large amount of gas would necessarily have been required, perhaps as much as 1150 cubic feet of gas, to obtain the proper percentages necessary to the gas burning in the tunnel and exploding in the vicinity of the meter, particularly with the strong draft of air eastward in the tunnel. When the oil furnace in the southeast corner of the basement was in operation it consumed a large amount of air and created a strong draft in the basement in that direction, but the furnace had been shut down about 3:30 P. M. before the explosion at 5:30 P. M.

There had been complaints of the smell of gas in the basement of the building for 3 months before the explosion. The Gas Company had been notified, tests had been made along the west wall (every week) and in the vicinity of the gas meter, but nothing was found. One report of gas had been made the week preceding the explosion and the Gas Company was notified. The break in the main must have occurred some weeks prior to the explosion for the gas to have traveled 80 feet along the main to where it was discovered the evening after the explosion.

Grand Avenue was a heavily traveled thoroughfare. The pavement, above where the break in the main occurred, was cracked, rough and uneven, but gas was ▮ not escaping through it. Some patches in the street were as much as 2 inches below the surface level. The break in the gas main was a typical fatigue fracture and, in the opinion of an expert, was broken because it was improperly supported, because it was subject to the heavy traffic loads and because of vibration and shock being transmitted from traffic to the pipe. The color of the soil about the break, indicated that the break had occurred some weeks or months before the explosion. The gas main could not have been broken by the explosion, since the west wall was not cracked or disturbed. In the opinion of experts, the explosion was a natural gas explosion, the gas came from outside the building and from the break in the main.

Before determining the issue raised by the demurrer to the evidence, we consider the errors assigned with reference to the admission of evidence. The Gas Company assigns error on the admission of certain evidence given by five witnesses, who testified as experts. Three were plaintiff's witnesses and they were cross examined at length by counsel for the Insurance Company. The evidence objected to being developed on cross examination. Two were witnesses for the Insurance Company. The evidence objected to is set out in 18 subdivisions, and is so extensive it cannot be set out in this opinion. Some of the opinion evidence of the experts to which objection is made is that the explosion was caused by natural gas; that the gas main

was not broken by the explosion, but before, because laid entirely too shallow and because of traffic transmitting shock to the pipe; that "the explosion would have to travel through that wall, through the rock and earth and hit that main on a slant to break it"; that the retaining wall was not disturbed by the explosion; that the gas causing the explosion came from the break in the gas main and followed crevices in the rock strata underlying the gas main, and through the old abandoned tunnel, to the tunnel under the basement; that the gas, ignited at the brass plate and burned through the tunnel and the flame came out at the west end of the tunnel, found an explosive mixture above and exploded, the central force of the explosion being above the manhole; that the color of the soil about the break in the pipe was caused by gas; that the color evidenced that the gas had been escaping several weeks or several months; that "there could be but a very small percentage of methane in sewer gas"; and that one would expect to find leaks in the house gas pipes by reason of the explosion jarring the building.

Appellant Gas Company contends that the witnesses were not qualified; that the evidence was only the opinion or conclusion of the witnesses; that it was based upon improper and incompetent inferences, on speculation and conjecture; that it invaded the province of the jury; that it decided, in some instances, the ultimate question at issue; that part of it was based on hypothetical questions, involving facts not disclosed by the evidence; and that all was prejudicial and harmful to the Gas Company.

■ "The question of the qualification of a witness to testify as an expert is to be determined by the trial court. It is a matter resting largely in its discretion and will not be reviewed unless it appears that such discretion was abused. Arnold v. Alton R. Co., 348 Mo. 516, 154 S. W. (2d) 58, 62; Wild v. Pitcairn, 347 Mo. 915, 149 S. W. (2d) 800, 804. Checking the qualifications of the several witnesses, who testified as experts and whose testimony is objected to, we are of the opinion that the record shows no abuse of the court's discretion in that regard.

■ As a general rule, a witness must state facts, from which the jurors are to form their opinion. "But when the facts are all stated, upon a subject of inquiry, if an intelligent opinion cannot be drawn therefrom by inexperienced persons, such as constitute the ordinary jury, an exception is made to the general rule, and persons who, by experience, observation, or knowledge, are peculiarly qualified to draw conclusions from such facts, are, for the purpose of aiding the jury, permitted to give their opinion. The exception is allowed from necessity. An expert witness, in a manner, discharges the functions of a juror; and his evidence should never be admitted unless it is clear that the jurors themselves are not capable, from want of experience, or knowledge of the subject, to draw correct conclusions from the

facts proved." Cole v. Uhlmann Grain Co., 340 Mo. 277, 100 S. W. (2d) 311, 322. An "expert must possess knowledge from education or experience which will aid an ordinary jury in forming an opinion on the subject matter of inquiry, when from common experience they could not do it correctly." Bebout v. Kurn, 348 Mo. 501, 154 S. W. (2d) 120, 125; Homan v. Missouri Pac. R. Co., 334 Mo. 61, 79, 64 S. W. (2d) 617, 625. It is "not a valid objection to proper expert testimony that the question invades the province of the jury or calls for a conclusion of the witness, so long as it is not a conclusion of law." Cole v. Uhlmann Grain Co., supra; Mann v. Grim-Smith Hospital & Clinic, 347 Mo. 348, 147 S. W. (2d) 606. "An expert witness, necessarily, states his conclusions about certain matters which would not be permitted of other witnesses. As long as his opinion is not a mere guess or conjecture, but is based upon facts or adequate data, it is properly received." Vitale v. Duerbeck, 338 Mo. 556, 92 S. W. (2d) 691, 695.

The source and cause of the explosion, presented a situation too involved and complicated for the ordinary juror and it is apparent that the opinion testimony of the experts would be helpful. The jury of course had the right to believe or disbelieve their testimony. The opinions of the experts, under the facts shown by this record, were not mere speculation and conjecture. Facts were stated and qualifications shown so that the opinions given might aid the jury. The court did not err in holding the testimony of these experts was admissible. Fair Mercantile Co. v. St. Paul Fire & Marine Ins. Co. (Mo. App.), 175 S. W. (2d) 930; Phares v. Century Elec. Co., 336 Mo. 961, 967, 82 S. W. (2d) 91, 95.

 The Gas Company contends that there was a failure of proof; that plaintiff did not make a submissible case for the jury; that there was no direct evidence that gas from the broken 4 inch main entered the basement or caused the explosion; that the opinions of the experts were predicated upon speculation and conjecture and were insufficient to make a submissible case; that the Gas Company's evidence showed the gas causing the explosion could have come from the house gas pipes or from sewer openings in the building; that the factual inferences from the proof made were inconsistent; that inference was based on inference; that plaintiff did not show with reasonable certainty that the cause for which the Gas Company would be liable proximately caused the injury; that the verdict was based upon guess work, conjecture and speculation; and that the doctrine of res ipsa loquitur was not applicable to the Gas Company.

The cause was not submitted against the Gas Company under the res ipsa loquitur doctrine, but on specific negligence and instruction 2 required a finding that the break in the gas main and the accumulation of dangerous quantities of gas in the basement of the building had existed for such a length of time prior to the explosion that, in

the exercise of due care, the Gas Company should have discovered the break and leak and warned plaintiff, or "repaired and stopped said leak," and avoided the explosion and injury to plaintiff.

While the Gas Company assigns error on the refusal of its peremptory instruction at the close of plaintiff's case and at the close of its own evidence, we need only consider the request at the close of all the evidence. The first request was waived by subsequently offering evidence and the second one was out of place, until the close of all of the evidence. It will be unnecessary to review the evidence further. Considering the evidence favorable to plaintiff, as we have, and the reasonable inferences to be drawn therefrom, we hold that the evidence was sufficient to make a submissible case against the Gas Company and to warrant a finding in favor of plaintiff on the issues submitted by plaintiff's instruction 2 against the Gas Company. James v. Bailey Reynolds Chandelier Co., 325 Mo. 1054, 30 S. W. (2d) 118.

The Gas Company assigns error on the refusal of its instructions "P" and "O". Instruction "P" would have told the jury that the sufficiency of the depth to which the gas main was laid beneath the surface of the street "as an element of negligence against the defendant Gas Company," was withdrawn from their consideration. Instruction "O" would have withdrawn any question of whether the gas main was caused to be broken by traffic, "as an element of negligence against defendant Gas Company." The circumstances concerning the depth to which the gas main was laid and the effect, if any, of traffic in causing the break were matters properly for the consideration of the jury in determining whether the main had been broken prior to the explosion. The petition did not contain any such charges of negligence as were sought to be withdrawn from the jury and no such charges were contained in the instructions given at plaintiff's request. We may assume that the jury was guided by the instructions given. The giving and refusal of withdrawal instructions is within the sound discretion of the trial court and, unless that discretion is abused, the action of the trial court will not be disturbed. Atchison v. Weakley, 350 Mo. 1092, 169 S. W. (2d) 914, 917; Kick v. Franklin, 345 Mo. 752, 137 S. W. (2d) 512, 516; Raymond on Missouri Instructions, Vol. 1, Sec. 157, p. 166; Davis v. Buck's Stove & Range Co., 329 Mo. 1177, 49 S. W. (2d) 47, 52. The trial court did not abuse its discretion in refusing instructions "P" and "O".

The Gas Company assigns error on the giving of instruction G-m as prejudicial to the Gas Company because imposing and giving undue prominence to plaintiff's theory that gas seeped into the building from the gas main in the street. The instruction was given at the request of the Insurance Company and presented the Insurance Company's theory. An instruction requiring the finding of essential facts to a verdict in favor of a defendant is not a comment on evi-

dence nor the undue emphasizing of the facts required to be found. Ward v. Mo. Pac. R. Co., 311 Mo. 92, 277 S. W. 908, 911; Bloecher v. Duerbeck, 333 Mo. 359, 62 S. W. (2d) 553, 558; Ward v. Fessler (Mo. Sup.), 252 S. W. 667, 671; Grubbs v. Kansas City Public Service Co., 329 Mo. 390, 45 S. W. (2d) 71, 79. We are unable to see how this instruction could adversely affect the Gas Company, as between plaintiff and the Gas Company, particularly since the question of whether or not leaking gas from the Gas Company's mains entered the building, or caused the explosion, was covered in other instructions, including several given at the request of the Gas Company.

Error is assigned on the giving of instruction No. 2, directing a finding against the Gas Company if certain hypothetical facts were found by the jury. The Gas Company, on the theory that the petition did not charge any negligence at all, contends that the specific charge of negligence upon which the instruction is based was not stated in the petition; and that there was no evidence to support the instruction, that is, no evidence that gas from the break in the main had accumulated in the basement of the building, and for such time prior to November 17, 1939, that by the exercise of due care the Gas Company should have discovered the break and leak and the presence of gas in time to have warned plaintiff and repaired or stopped the leak and prevented the explosion and injury. We have held that the petition stated a cause of action and that the evidence was sufficient to make a case for plaintiff on the theory submitted. The court did not err in submitting the cause on the special negligence shown by the evidence. Grimes v. Red Line Service Co., 337 Mo. 743, 85 S. W. (2d) 767; Watts v. Moussette, 337 Mo. 533, 85 S. W. (2d) 487, 491; State ex rel. and to Use of Reeves v. Shain, 343 Mo. 550, 122 S. W. (2d) 885, 887.

Instruction 3 given at the request of plaintiff, advised the jury that "by 'due care' as used in these instructions with reference to defendant Kansas City Gas Company, is meant the highest degree of care. By 'the highest degree of care' is meant that care which a very careful and prudent person would use under the same or similar circumstances." The Gas Company assigns error on the giving of instruction 3 and contends that it was prejudicially erroneous since the Gas Company was only required to exercise ordinary care commensurate with the danger to be avoided.

We do not find that this court has directly ruled the issue presented. No such case has been called to our attention, although in the case of Paden v. Van Blarcom, 181 Mo. 117, 132, 79 S. W. 1195, this court in effect approved the rule stated in Barrickman v. Marion Oil Co., 45 W. Va. 634, 44 L. R. A. 92, as follows: " 'A person or corporation engaged in furnishing natural gas to stoves, heaters, pipes, etc., for the purpose of domestic light, heat, and fuel in a

dwelling house, is bound to exercise such care, skill, and diligence in all its operations as is called for by the delicacy, difficulty and dangerousness of the nature of the business, that injury to others may not be caused thereby; that is to say, if the delicacy, difficulty, and danger are extraordinarily great, extraordinary skill and diligence are required.' "

In the case of Sipple v. Laclede Gaslight Co., 125 Mo. App. 81, 89, 102 S. W. 608, 611, the St. Louis Court of Appeals said: "From a careful study of the gas cases elsewhere, and with due attention to the judgment of the soundest courts and opinions of the ablest judges in the country, we have been able to deduce and ascertain the rule that in view of the highly dangerous character of the commodity being transmitted by the gas company through its mains, and because of its well-known tendency to escape therefrom through the earth and permeate the atmosphere as an element not only entailing possible but probable death and disaster, the principle applicable to its transmission and conduct is that the producer or transmitter of the gas, is required to conduct his operations in that behalf with a very high degree of care and skill. It being an extraordinarily dangerous element, an extraordinarily high degree of skill and care is exacted by the law of those conducting it; that is to say, the rule of ordinary care with respect to its transmission is adjusted, in view of its known dangers and probable entailments, by a standard of care proportionate to the probable dangers which usually attend the delicacy, difficulty, nature and dangers of the business as natural consequences . . . even though this degree of care might extend the requirement in that behalf slightly beyond the general rule with respect to the exercise of ordinary care to avoid such dangers only as are to be reasonably anticipated in the conduct of a particular business."

In the case of Nomath Hotel Co. v. Kansas City Gas Company, 204 Mo. App. 214, 223 S. W. 975, 980, the Kansas City Court of Appeals said: "It is true, owing to the very dangerous character of gas and because of its well-known tendency to escape from the mains and percolate through the earth into cavities or openings and there burn or explode, causing great injury, the defendant is charged with a very high degree of care in the transmission and control thereof. . . . A gas company is not an insurer, but is held to a degree of care commensurate with the dangerous character of the commodity it handles." See, Taylor v. St. Joseph Gas Co., 185 Mo. App. 537, 539, 172 S. W. 624; Brauer v. St. Louis County Gas Co. (Mo. App.), 238 S. W. 519, 521; Messmer v. St. Louis County Gas Co. (Mo. App.), 42 S. W. (2d) 963, 965; Hanson v. City Light & Traction Co. (Mo. App.), 178 S. W. (2d) 804, 810; 38 C. J. S., Sec. 42, p. 731; 28 C. J. 590, Sec. 56; 24 Am. Jur. Gas & Oil, Sec. 129, p. 615; Hout's Missouri Pleading & Practice, Vol. 5, Forms 1564 and 1756; 138 A. L. R. 870. An

annotation, 25 A. L. R. 262, states: "The rule deducible from the reported decisions is that, in view of the highly dangerous character of gas and its tendency to escape, a gas company must use a degree of care to prevent the escape of gas from its pipes proportionate to the danger which it is its duty to avoid."

The Gas Company was only required to use such degree of care as an ordinarily prudent person would exercise under like circumstances in dealing with such a dangerous commodity. "Ordinary care is a relative term, and its exercise requires precautions commensurate with the dangers to be reasonably anticipated under the circumstances." Stumpf v. Panhandle Eastern Pipeline Co., 354 Mo. 208, 189 S. W. (2d) 223, 228. The court erred in giving instruction 3. It will be unnecessary to rule the issue presented with reference to the verdict of the jury.

We now consider plaintiff's appeal from the verdict and judgment in favor of the Insurance Company. In addition to the facts heretofore stated, it was admitted that the Insurance Company owned and operated the building at and before the time of the explosion. There was evidence that plaintiff, three months before the explosion, had reported to the superintendent of the building that he smelled natural gas in the basement; that plaintiff subsequently made two or three complaints to the superintendent; and that others had complained of gas quite often, one complaint being made a day or so before the explosion. The superintendent of the building notified the Gas Company that these parties had complained of smelling gas in the building and a man was sent over to make tests, but no gas was discovered. The Insurance Company had no mechanical equipment for testing for gas leaks and maintained no regular system of inspection, although some pipes were tested by tapping with a hammer and with soap and water. After the explosion, tests were made and it was found that there were leaks in the house gas pipes in the building and some of the pipes were very thin and rusty. Tests made along the west wall, before and after the explosion, indicated that no gas was coming through the wall or from about the meter. The barbershop was located adjacent to a storeroom and only a few feet from the gas meter location, the center of the explosion. In addition to the leaks in the house gas pipes, openings were found in the sewer pipes in the basement of the building, which openings would permit sewer gas to escape into the building. A sewer main trap was ██ on the sewer side, rather than the house side, and sewer gas could have escaped therefrom. Some sewer pipes were broken and sewage dripped into the sub-basement tunnel. Sewer gas is always present in sewers and it contains methane and is explosive. The explosion might have been caused by a combination of gases. A chart on a gas pressure gage near the building showed a

sudden release of pressure at 5:30 P. M. (at the time of the explosion) as would have been made by a sudden break in a gas main.

It was plaintiff's theory that part of the gas involved in the explosion came from the leaky sewer pipes and the house gas pipes in the building and, of course, plaintiff profited by the evidence and efforts of each defendant to shift liability for the explosion and injuries to the other. The Insurance Company contended the leaks in the house gas pipes were caused by the explosion and the Gas Company contended that the break in its main was caused by the explosion. As stated, the petition charged general negligence. The cause was submitted against the Insurance Company under the doctrine of res ipsa loquitur.

Plaintiff, appellant, assigns error on the giving of three instructions requested by the Insurance Company. Instruction G-m directed a verdict for the Insurance Company if the jury found (among other facts) that the explosion was caused by natural gas, and that said gas did not leak or come from any pipes in the building, but seeped and leaked into the building from the Gas Company mains in the street, and if the Insurance Company "did not know, and in the exercise of ordinary care on its part could not have known that said gas had seeped into said building, if so, in explosive quantities, then you are instructed that you cannot find a verdict against the defendant Metropolitan Life Insurance Company . . . ."

Instruction H-m told the jury that the Insurance Company "was only required to exercise ordinary care in discovering the existence of natural gas in explosive quantities."

Instruction I-m told the jury "that the burden of proof is upon the plaintiff to prove that the defendant, Metropolitan Life Insurance Company, knew, or in the exercise of ordinary care, should have known, that there was an explosive quantity of natural gas coming into or accumulating within the tunnel or basement of its building, in dangerous and explosive quantities, in time, by the exercise of ordinary care on its part, to have changed or remedied the said condition, if it existed, before the explosion . . . ."

Plaintiff contends that, under the law, the Insurance Company had no right to delay action, with knowledge of escaping gas, until the danger was imminent from "explosive quantities of gas"; and that instruction G-m placed an excessive and unlawful burden on plaintiff to prove notice of danger so imminent. Plaintiff-appellant insists that in no event was he required to show more than "that gas was escaping into said building and that said defendant had actual or constructive notice thereof." As stated, the evidence disclosed that 5 to 13% of natural gas mixed with air was explosive. Any quantity of gas, therefore, mixed with air in the proper percentage was explosive. But in view of the instruction, the Insurance Company was not liable, unless it had actual or constructive knowledge

that *"explosive quantities"* of gas had *seeped into said building.* (Italics ours.) Under instruction I-m, plaintiff was required to prove that the Insurance Company had actual or constructive knowledge "that there was an explosive quantity of natural gas accumulating *within the tunnel or basement of its building."* (Italics ours.) The Insurance Company insists that, since any quantity of gas is explosive when combined with a proper mixture of air, the jury was required to find that it had no knowledge that there was *any gas* in the building before returning a verdict for it; that there is a difference between "explosive quantity" and an "explosive mixture"; and that the instruction does not limit the Insurance Company's liability to discovery of an "explosive mixture."

We think the instructions erroneous and misleading in the respect complained of. An "explosive quantity" of natural gas coming into or accumulating within the tunnel or basement of its building," or "that said gas had seeped into said building, if so, in explosive quantities," would necessarily be understood to mean "an explosive mixture" in the particular place, or part of the building. Under the evidence, until the amount of gas in the air of the basement, tunnel or building had reached 5%, it was not explosive and an ▮▮ explosive quantity was not present. Any quantity mixed in a less percentage was not explosive. Under the instructions, until the percentage of gas in the air had reached or exceeded 5%, no duty was imposed on the Insurance Company. Plaintiff was required to show that there was an "explosive quantity" of gas in the building, basement or tunnel (that is 5% or more by volume) and that the Insurance Company had actual or constructive knowledge thereof. This imposed an unlawful burden on plaintiff and, in effect, required a showing that the danger was imminent and certain if the gas was ignited. Actual or constructive knowledge that natural gas was seeping into the building, basement or tunnel or was accumulating therein, imposed a duty to exercise care commensurate with the circumstances in managing and controlling the dangerous commodity. The Insurance Company could not wait until it had actual or constructive knowledge that *the amount of gas* had reached an *explosive quantity,* that is, 5% or more, in the building, basement or tunnel. "If a defendant in the exercise of ordinary care should have known the situation was unsafe and that some injury was likely to result, not that such was a remote possibility, he is bound to fend against it." Guthrie v. City of St. Charles, 347 Mo. 1175, 152 S. W. (2d) 91, 98. The instructions do not correctly state the duty which the Insurance Company owed to plaintiff and they were misleading and highly prejudicial.

▮▮ Plaintiff further contends that the Insurance Company's instructions limited "plaintiff's right of recovery to said defendant's specific negligence in not discovering the presence of natural gas in

'explosive quantities,' after such a mixture formed and before said explosion," and in time to have remedied said condition. Plaintiff says said instructions were in direct conflict with plaintiff's instruction No. 1, under the res ipsa loquitur doctrine, authorizing a recovery if said defendant was in control of the building when the explosion occurred, without requiring proof of previous notice of the seepage or accumulation of gas in explosive quantities, or that it came from within or without the building. The Insurance Company replies that plaintiff, with the aid of the Insurance Company, proved the exact cause of the explosion and showed the cause of the explosion was beyond the control of the Insurance Company. The Insurance Company says that plaintiff in his instruction against the Gas Company submitted and the jury found "the exact cause of the explosion." The Insurance Company further contends that the evidence shows that it did not create the condition and hence its liability could only be predicated on knowledge; that, on the evidence, the only issue between plaintiff and the Insurance Company was "whether or not the gas had accumulated in the building a sufficient length of time to bring actual or constructive knowledge thereof to this defendant; and that "that issue was one of specific negligence."

Whether the gas causing the explosion came from the house pipes, the gas main or from some other source was a question of fact. Whether the leaks in the house pipes or the break in the gas main, either or both, existed before the explosion were questions of fact. There was also evidence that sewer gas could have entered the building; that sewer gas is always present in sewers; that such gas is explosive and would have been wiped out by the explosion; and that the explosion could have been of a mixture of gases. Under the evidence the jury could have found that the Insurance Company was in complete control of the situation and premises, when and where the explosion occurred, and at and before the explosion. The evidence offered by plaintiff concerning the break in the main and the invasion of the premises by natural gas from *without* the building did not show the cause of the explosion was beyond the control of the Insurance Company, but that, being in possession and control, of the building, the Insurance Company should have discovered and stopped the entrance of gas into the premises from any source. The evidence, considered as a whole, did not show the cause of the explosion with such certainty and definiteness as to require a submission of the cause on specific negligence against the Insurance Company. The real cause of the explosion remained in doubt and was for the jury. Whitaker v. Pitcairn, 351 Mo. 848, 174 S. W. (2d) 163, 168. The Insurance Company's instructions in limiting plaintiff's recovery to the specific negligence mentioned therein (failure to discover "that said gas had seeped into said building, if so, in explosive quantities") were erroneous and prejudicial to plaintiff and directly conflicted

with plaintiff's instruction in that they limited plaintiff's right of recovery under the res ipsa loquitur doctrine.

The judgment is reversed and the cause remanded. *Bradley* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.