### George NAKOS, Appellant,

### v.

### William DEAN et al., Respondents.

### No. 24587.

Kansas City Court of Appeals.

Missouri.

June 5, 1967.

Morris A. Shenker and Frank B. Green, Jr., St. Louis, for appellant.

Kay & Quigley, Robert J. Quigley, Eldon, for respondents.

HOWARD, Presiding Judge.

This case grows out of a collision between two outboard motorboats on the Lake of the Ozarks on July 16, 1964. Plaintiff sued for personal injuries and property damage in the total amount of $5,000.00. The defendants Needham and Dean, each counterclaimed, Needham for personal injuries and Dean for property damage. Trial to a jury resulted in a verdict and judgment for Needham in the amount of $7,000.00 and for Dean in the amount of $500.00. Appellant Nakos has duly appealed to this court charging that the trial court erred in failing to direct a verdict for plaintiff and against each defendant on their respective counterclaims, for the reason that defendants were guilty of contributory negligence as a matter of law. Needham was operating the motorboat, which belonged to his employer Dean, in the course of his employment.

Plaintiff contends that if Needham was contributorily negligent, such negligence is imputable to his employer Dean, and the defendants do not contest this contention. In view of the issues presented, the parties are in agreement that we must view the evidence in the light most favorable to the verdict and judgment entered for defendants.

Plaintiff, together with his brother-in-law and a friend by the name of Orphan and their respective families, had arrived at the Lake of the Ozarks on the afternoon of July 16, 1964. The brother-in-law lived in New York and did not appear at the trial. Mr. Orphan testified briefly in corroboration of plaintiff's testimony.

About 5:30 in the afternoon, after plaintiff had launched his boat and gassed it up, the three men started for a boat ride, which shortly ended in the collision. The area of the collision was on the south shore of the Lake of the Ozarks, near Bagnell Dam. Defendant Needham started out from Dean's Boat Dock located in the first cove west of Bagnell Dam on the south shore. He intended to proceed in a westerly or northwesterly direction up the main lake in search of a rented fishing boat which was overdue. This intended course would take him across the mouth of the second cove west of the dam, from which plaintiff was emerging. The collision occurred in the general area where the cove runs into the main body of the lake. The exact location is in dispute. In fact, the evidence on behalf of the parties is in hopeless conflict and we will therefore set out the factual evidence presented by each party separately.

Plaintiff testified that he started out of the cove, where he had gassed his boat, and was running between the center of the cove and the east shore line. His speed did not exceed an estimated 10 to 25 miles per hour. He saw defendant's boat, as it came in view from behind the point separating the two coves; plaintiff immediately

cut his motor and his boat came to a stop in the water. He testified that defendant was approaching at a high rate of speed, which he estimated at approximately 25 miles per hour or more. When plaintiff's boat stopped, it was not in the path of defendant's boat. Defendant made a sharp and complete left turn, heading straight for plaintiff's boat. Plaintiff started to jump up, yelling and waiving his arms and defendant's boat ran into plaintiff's boat almost dead center. The bow of defendant's boat split the hull of plaintiff's boat, under the deck and landed on top of plaintiff's leg, or as he said "in my lap". Defendant then put the boat in reverse, backed away from the wreck, swung his boat around and started on west. In swinging the boat around defendant's outboard motor almost came in contact with plaintiff. Plaintiff was entangled in the wreckage and reached for a piece of rubber bumper hanging from the nose of defendant's boat but defendant backed away. Plaintiff managed to extricate himself from the wreck and although Mr. Orphan could not swim, all three men managed to get out of the water on the west shore of the cove. Someone in another boat got a line on plaintiff's sinking boat and it was dragged onto the west shore of the cove. Plaintiff soon thereafter found defendant's boat beached on the west shore of the cove near the point. He observed damage to the front end of defendant's boat and testified there was no damage to the rear end of defendant's boat.

Mr. J. W. Marberry, a school teacher in the lake area, testified as a witness for defendant. He had been pulling some water skiers and at the time of the collision his boat was stopped in the cove from which plaintiff was emerging near the point between this cove and the cove in which defendants' boat dock was located. He was standing in the rear of his boat pulling in the ski lines, when he saw the two boats on a collision course. Defendant did not turn into the cove, but kept straight up the main lake. He observed plaintiff's boat coming out of the cove. At this point defendant's boat was about 120 feet from Marberry, headed west or northwest, up the main lake and plaintiff's boat was about 90 feet from defendant's boat headed north or northwest coming out of the cove. The witness stated that the defendant's boat was travelling faster than the plaintiff's and estimated defendant's speed at 28 to 30 miles per hour and plaintiff's speed at 8 to 10 miles per hour. The witness saw that the boats were on a collision course unless somebody turned, and he watched them crash. His vision was unobstructed. He testified that the boats came together at an acute angle of less than 90 degrees. He was not asked to and did not attempt to more accurately describe the angle at which the two boats came together. He testified that plaintiff's boat went over the top of defendant's boat; the front end of plaintiff's boat hanging and then sliding back down after it began to fill with water. This witness was to the southeast of the point of collision and was, as he stated, behind the two boats when they crashed. Neither boat slowed or changed course prior to collision. On cross-examination the witness testified that plaintiff's boat did not hit the back end of defendant's boat, but rather went up on defendant's boat, behind the windshield on the left side of defendant's boat. There was no damage to the cutting edge of the bow of plaintiff's boat, but a large gaping hole was knocked in the right part of the bow and extending back almost to the front seat on the right side. When the witness first saw that the two boats were on a collision course, they were both about the same distance from the point of collision with the plaintiff's boat being a little closer than defendant's boat. After the collision, the witness started the motor on his boat and went to assist the people in the water. He threw them a life jacket, and after he saw that they were in shallow water, looked around and discovered the defendant Needham sitting in defendant's boat, a little way out in the water toward the channel from the point of

collision, and not far from the point on the west shore of the cove. The motor of his boat was running, but it was not in gear. The witness hollered at Needham twice before he got his attention and told him to put his boat in gear and run it into the west shore. Needham did so, and thus beached his boat. Marberry testified that the defendant did not put his motor in reverse and back away from the collision.

The defendant Needham testified that he was going up the lake and was progressing straight across the cove out of which plaintiff came, and was about at the middle of the cove, when he felt a thud and was raised up out of his seat and fell over in the seat to his left. He had severe pain in his shoulder. He never did, at any time, see plaintiff's boat before the collision. He did not turn into the cove, but was going straight up the lake. He denied putting his boat in reverse and backing away from the collision. Defendant estimated that he was going 15 to 20 miles per hour at the time of collision; he was going "two quarter throttle". Defendant Needham admitted that boat collisions were becoming frequent on the lake and one had to be careful to avoid them, and that this was particularly so in the area near the dam where the collision occurred. He did not see plaintiff's boat while it was in contact with his boat; but only afterwards, when it was beginning to sink. He testified that there was no damage to the front end of the defendant's boat after the collision. "It was perfect." Numerous photographs of both boats were introduced in evidence, together with testimony as to the condition of the two boats after the collision. From this evidence, it appears that defendant's boat had damage to the rubber bumper running around the bow of the boat in three places. Defendants testified that this was wear and tear caused by inexperienced people who rented the boat and who ran it into the dock when they came in; that this damaged condition existed prior to the collision. The rear left corner of defendant's boat, which was made of fiberglass, had a hole in it that was not pushed all the way through and the freeboard (which is a piece of fiberglass running the full length of the left side of the boat) was torn loose at the left rear and raised some distance above the hull of the boat. There were two holes in the bottom of the defendant's boat at about the place where the windshield is located. This damage was apparently caused when Needham beached the boat after the collision. The motor on the back of defendant's boat was dented and scarred. There was a wood sliver shoved through a rubber gasket around the motor and there were wood slivers inside the motor. These were described as mahogany slivers, the color of the wood on plaintiff's boat.

■ From this evidence plaintiff contends that, as to their counterclaim, defendants were guilty of contributory negligence as a matter of law in failing to keep a lookout. This contention is aptly summarized from the following quotation from plaintiff's brief: "Appellant submits that all reasonable men in the exercise of a fair impartial judgment would draw but one conclusion from the evidence, namely that Dan Needham failed to exercise due care to keep a careful lookout in the operation of his motorboat." The duty to keep a lookout is imposed upon the operator of motorboats, as well as the operator of other vehicles. See Kiburz v. Loc-Wood Boat and Motors, Inc., Mo., 356 S.W.2d 882. The scope of the duty to keep a lookout is discussed with care in De Mariano v. St. Louis Public Service Co., Mo., 340 S.W.2d 735, l.c. 743, where the court said: "Except as otherwise declared by statute (such as in the case of operators of motor vehicles upon the public highways), the degree of care required of a pedestrian is precisely the same as the common law duty of a traveler by any means of locomotion whatsoever, to wit: that of ordinary care. 'Ordinary care' is a relative term and its exercise requires such precautions as are commensurate with the dangers reasona-

bly to be anticipated under the circumstances. Stumpf v. Panhandle Eastern Pipeline Co., 354 Mo. 208, 189 S.W.2d 223, 228; Stephens v. Kansas City Gas Co., 354 Mo. 835, 191 S.W.2d 601, 609; Tharp v. Monsees Standard Service, Mo.Sup., 327 S.W.2d 889, 893; Reese v. Illinois Terminal R. Co., Mo.Sup., 273 S.W.2d 217, 221. In the instant case the evidence showed the loop to be a busy place, with employees and invitees walking in all directions. Obviously, collisions between them were inevitable unless each exercised ordinary care not to collide with others. The only conceivable way in which to exercise such care is by way of lookout. The evidence favorable to plaintiff showed that as she walked in a normal manner for some distance directly toward the bus, she was struck from the rear by Hellmann. Surely, under those circumstances, the fact that Hellmann never saw plaintiff before running into her, in and of itself, warrants an inference of his failure to keep a lookout. The evidence made a jury issue of the failure of defendant's servant to exercise due care."

Defendants do not seriously contest this duty to keep a lookout but do contest that under the facts there was any failure to perform such duty and more particularly that they were guilty of contributory negligence as a matter of law under the circumstances shown.

The record in this case is replete with witnesses pointing out their locations on a freehand drawing of the area, which is in evidence, without marking on the exhibit, with imprecise testimony as to directions, which apparently resulted from the fact that nobody knew exactly what the correct directions were, and with other testimony in relation to the exhibits, which may have been helpful to the jury, but which conveys no useful information on a mere reading of the transcript. From the evidence as heretofore summarized, the relative position and speed of the two boats at various times can not be precisely fixed. The jury was not bound to accept plaintiff's version of the facts, and, on this appeal, we must view the evidence in the light most favorable to the verdict for the defendants. Doing so, we can not say, with any certainty, where the plaintiff's boat was located at any particular time prior to the collision. Defendants' theory was that plaintiff ran into defendant's boat from the rear. The testimony does not show and the photographs do not indicate any damage to the transom which runs across the back of defendant's boat, other than the lifting of the freeboard from its fastening to the left rear corner of the hull of the boat. This, together with the testimony of witness Marberry indicates that the two boats came together at an acute angle with the right front side of plaintiff's boat striking the left rear side of defendant's boat. We do not know at what angle these boats approached each other and the estimates of relative speed of each are of little help. From the extent of damage to plaintiff's boat, the jury could well have found that the collision occurred at a relatively high rate of speed.

■ All of these imponderables make the question of contributory negligence on the part of the defendants in failing to keep a lookout a proper question for submission to the jury, but present a situation in which this court can not say as a matter of law that the defendants were guilty of contributory negligence. Many cases, such as Branscum v. Glaser, Mo., 234 S.W.2d 626, Frandeka v. St. Louis Public Service Co., Mo., 234 S.W.2d 540, and James v. Berry, Mo.App., 301 S.W.2d 530, cited by plaintiff, hold that where the law imposes a duty to look, to look is to see and failure to see that which is clearly visible constitutes contributory negligence as a matter of law. However, we can not say that reasonable men would inevitably find that the positions and speed of the two boats in relation to each other were such that if defendant Needham had looked he would necessarily have seen plaintiff approaching on a collision course in time to have avoided the collision, and

that his failure to look and to see was negligent.

We therefore hold that the trial court did not err in failing to direct a verdict for plaintiff on each of defendants' counterclaims. The judgment is affirmed.

All concur.