**SKELLY OIL CO. v. HOLLOWAY et al.**

No. 13682.

United States Court of Appeals
Eighth Circuit.

Dec. 21, 1948.

C. A. Randolph, of Kansas City, Mo., for appellant.

Ira B. Burns, of Kansas City, Mo. (Burns & Burns and Chet Vance, all of Kansas City, Mo.), for appellees.

Before GARDNER, Chief Judge, and THOMAS and RIDDICK, Circuit Judges.

RIDDICK, Circuit Judge.

The plaintiffs below, Leon Holloway and his wife, Helen Holloway, brought this action against the Skelly Oil Company to recover damages for the destruction of their house and furnishings by fire alleged to have been caused by negligence on the part of the defendant company. The case was tried before a district judge sitting without a jury and resulted in a judgment in favor of plaintiffs from which this appeal was taken.

The complaint alleged the ownership by the plaintiffs of the house and furnishings in question; that the defendant was engaged in the manufacture, sale, and distribution of a propane gas known as "Skelgas" which is highly inflammable and explosive; that the gas was delivered to plaintiffs in tanks or cylinders connected to plaintiffs' distribution system supplying a gas stove and a hot water heater on the lower floor of the house; that prior to January 29, 1945, gas had leaked or escaped into the house from the distribution system and appliances, and that the tank had become empty; that plaintiffs requested defendant to discover and stop the leak in the distribution system and gas-burning appliances and to furnish a new supply of gas; that, in response to such request, defendant on January 29, 1945, sent its employees to plaintiffs' house; that the employees inspected the distribution system, found one leak, attempted to re-

pair it, affixed a new cylinder of gas to the system, and informed plaintiffs that the leak had been discovered and repaired and that the system was safe to use; and that no one had touched, changed, or interfered with the distribution system after defendant's employees had inspected it.

The complaint further alleged that on January 29, 1945, at about 3:45 P.M., the house and furnishings were destroyed by fire originating within the house and caused by gas escaping from the plaintiffs' distribution system and appliances; that the defendant had installed and arranged plaintiffs' gas distribution system in accordance with its own design. Negligence of the defendant was charged in the following particulars: failing to properly inspect plaintiffs' appliances and distribution system and to find and repair all leaks; connecting plaintiffs' appliances with the distribution system while gas was escaping therefrom; informing plaintiffs that the distribution system and appliances had no leaks and were safe to use; lighting the hot water heater while gas was escaping; failing to warn plaintiffs of escaping gas; breaking or causing a leak in the distribution system in the course of its inspection and repair; and affixing a 90 lb. pressure Skelgas cylinder with a defective and broken appliance thereon to control and regulate the pressure of gas in plaintiffs' distribution system.

The parties admit that there is no evidence to sustain the charge that defendant's servants broke or caused a leak in the gas distribution system in the course of its inspection and repair, and also no evidence to support the charge that there was a defective or broken appliance on the cylinder of Skelgas connected with the distribution system at the time the inspection and repairs were made. Charges of negligence concerning these matters, therefore, pass out of the case.

Defendant's answer admitted that prior to January 29, 1945, plaintiffs requested it to send an investigator to inspect plaintiffs' appliances within the house and the Skelgas cylinder located outside the house; that on January 29, 1945, in response to a complaint made on behalf of plaintiffs that they were using too much gas and a request for an inspection of their equipment, it sent its employees to the plaintiffs' house to make an inspection of the appliances and gas distribution system; that defendant's employees discovered a small gas leak in one of the appliances, repaired it, and installed a new cylinder of Skelgas; and that it had installed the distribution system in the house by agreement with the previous owner several years prior to the fire. Defendant admitted that the fire occurred, destroying the house, during the afternoon of January 29, 1945, but denied the allegations of negligence or that the fire was caused by escaping Skelgas.

The grounds for reversal urged by the defendant are that the trial judge failed to find the facts on which he reached his conclusion that defendant was guilty of negligence causing the fire, as required by Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.; and that, if the court's finding of fact can be accepted as a sufficient compliance with the rule, it is without support in the evidence and based wholly upon conjecture and speculation.

The court's finding of fact against which the defendant levels its attack is:

"On said 29th day of January, 1945, the defendant had undertaken to repair and rearrange its Skelgas tank and distribution system installed by it in plaintiffs' said house, and, in so doing, was negligent and thereby gas escaped from said tank or distribution system and flowed into the walls of said house, and, being inflammable, was ignited and caused the destruction of said house."

Defendant says that this finding is a general finding of negligence and not a special finding of the facts upon which the court has based its conclusion of negligence.

Rule 52(a) provides that the trial court in a nonjury case "shall find the facts specially and state separately its conclusions of law thereon." But, as recently amended, the rule contains the following, not present in the rule as originally adopted: "If an opinion or memorandum

of decision is filed, it will be sufficient if the findings of fact * * * appear therein." The rule is intended to aid the appellate court by giving a clear understanding of the basis of the trial court's decision. The trial court is not required to make findings on all the facts. It need only find such ultimate facts as are necessary to reach decision in the case. Brown Paper Mill Co., Inc. v. Irvin, 8 Cir., 134 F.2d 337, 338; McGee v. Nee, 8 Cir., 113 F.2d 543, 546. In Kelley et al. v. Everglades Drainage District, 319 U.S. 415, 422, 63 S.Ct. 1141, 1145, 87 L.Ed. 525, it is said that "there must be findings, stated either in the court's opinion or separately, which are sufficient to indicate the factual basis for the ultimate conclusion." In the opinion in the present case the judge said [72 F.Supp. 711]:

"A consideration of the evidence yields the inference that the gas escaping from the tank or distribution system of the defendant was responsible for the conflagration and that the defendant, through its agents, was negligent in permitting the gas to escape."

And again in a memorandum ruling denying the defendant's motion for a new trial, which challenged the sufficiency of the evidence to support the findings and conclusions of the trial judge and asserted that the findings were speculative and conjectural, the judge said:

"* * * The conclusion seems inescapable that, in the light of all the evidence concerning the conflagration admittedly experienced, the defendant was responsible for it by reason of the negligence of its employees. No testimony indicated the cause of the fire save only by reason of the inflammable gas that unquestionably escaped from the tank and distribution system installed by the defendant. On the contrary, the evidence is quite affirmative that the fire was caused by escaping gas."

When the court's findings of fact and memorandum opinions are read together, it appears that the court found that gas escaped from the gas distribution system and appliances into plaintiffs' house; that defendant's agents were negligent in permitting the gas to escape; and that the fire was caused by escaping gas. But, even so, defendant contends that the finding is merely a finding of general negligence, and that under Missouri law the plaintiff in an action for damages for negligence may not recover if, having alleged specific acts of negligence, he fails to prove at least enough of the acts alleged to entitle him to prevail. Or, to put the defendant's contention in other words, it is that the plaintiffs in this case have charged the defendant with certain specific acts of negligence causing the destruction of their house, that they have proved none of them, that the court has not so found, and that for this reason the judgment below must be reversed.

Unquestionably, defendant is right in its position concerning the Missouri law on the question under discussion. "* * * whatever may be the rule in other jurisdictions, the rule is well settled in Missouri that the doctrine of res ipsa loquitur does not apply where the plaintiff bases his recovery upon specific acts of negligence alleged in his petition, instead of charging negligence in general terms. In that situation plaintiff assumes the burden of proving the specific acts of negligence alleged, and, as in other cases, must recover, if at all, upon the negligence pleaded." Kuhlman v. Water, Light & Transit Co., 307 Mo. 607, 271 S.W. 788, 798. "The rule is that 'one who pleads specific acts of negligence must prove such negligence or enough of such acts to justify a recovery, and a failure so to do bars him from a recovery. And this is true although he might have pleaded negligence generally and by an invocation of the doctrine res ipsa loquitur had a recovery upon making proper proof.'" Maxie v. Gulf, M. & O. R. Co., 356 Mo. 633, 202 S.W.2d 904, 910, and cases cited; May Department Stores Co. v. Bell, 8 Cir., 61 F.2d 830, 836.

The opinion of this court in the May Department Stores Co. case contains a full discussion of the Missouri rule and of the difficulty of reconciling Missouri cases on the question, "what is to be regarded as an allegation of specific negligence and

what an allegation of general negligence." 61 F.2d 836. But, in the present case we think it may be said of the complaint, as indeed the plaintiffs do not deny, that the defendant was charged with specific acts of negligence. The reasonable interpretation of the court's finding that gas did escape from plaintiffs' distribution system and appliances into plaintiffs' house and that defendant's agents were negligent in permitting the gas to escape is, we think, a finding that defendant, as the complaint alleged, negligently failed to properly inspect plaintiffs' appliances and distribution system and to discover and repair the leaks in the system, and that defendant was negligent in connecting plaintiffs' gas installations with the supply of Skelgas when gas was escaping.

■ There is no dispute between the parties as to the law of the case. The rule is that, in view of the highly dangerous character of the gas and its tendency to escape, a distributor of gas to the public must use a degree of care in the installation and maintenance of conduits and appliances under its control commensurate with the danger or risk which it is its duty to avoid; that is to say, that one distributing gas to the public must exercise ordinary care, under the circumstances attending its operations, to maintain its facilities in a reasonably safe condition, and not that the distributor is liable as an insurer. Under the laws of Missouri, in the absence of a contract so requiring, a distributor of gas is not charged with the duty of inspecting or maintaining privately owned service pipes or appliances in the buildings or on the property of its customers. On receipt of notice from a customer of defects in the customer's service installations, the gas distributor may discharge the duty which the law imposes upon it by shutting off the supply of gas until such time as the owner of the defective pipes or appliances may have corrected the defects in them. But, if the distributor on receipt of such notice from a customer undertakes to inspect the service installation on the property of the customer and to discover and correct the leaks or other defects permitting the escape of gas on the owner's premises, the distributor is obligated to exercise a degree of care commensurate with the known dangerous character of gas to discover and repair the defects in the customer's installations. Barrickman v. National Utilities Co., Mo. App., 191 S.W.2d 265, 268; Hanson v. City Light & Traction Company, 238 Mo.App. 182, 178 S.W.2d 804, 809; Sipple v. Laclede Gaslight Co., 125 Mo.App. 81, 102 S.W. 608; Nomath Hotel Co. v. Kansas City Gas Co., 300 Mo. 240, 253 S.W. 975; Brauer v. St. Louis County Gas Co., Mo.App., 238 S.W. 519.

The important question in the case is, therefore, whether there was substantial evidence to support the court's finding that defendant negligently failed to find and stop the leaks in plaintiffs' installations.

■ In the solution of this problem we must take that view of the evidence and of the inferences reasonably deducible therefrom which is most favorable to the prevailing party. The power of a trial court in a non-jury case to decide doubtful issues of fact is not limited to deciding them correctly. On review, the question is not what finding of fact the trial court might have reached on the evidence before it, but whether there was substantial evidence upon which the finding which the court made could properly be based. We may not set aside the finding of fact of a trial court unless there is no substantial evidence to sustain it, unless it is against the clear weight of the evidence, or unless it was induced by an erroneous view of the law. Cleo Syrup Corp. v. Coca Cola Co., 8 Cir., 139 F.2d 416, 417, 418, 150 A.L.R. 1056; Voss Bros. Mfg. Co. v. Voss, et al., 8 Cir., 157 F.2d 263, 266; Hudspeth v. Esso Standard Oil Co., 8 Cir., 170 F.2d 418.

In the summer of 1943 plaintiffs purchased a house at Lake Lotawana, a lake resort district about 25 miles east of Kansas City in Jackson County, Missouri. The house was built on a slope in such a way as to have two ground levels, the north side of the house facing a road and the south side facing the lake. The north side of the lower floor of the house was built against an irregular natural rock ledge. The upper

floor extended over the lower floor and beyond the rock ledge toward the road. The outside walls of the lower floor were of rock construction. The inside walls and the ceiling of the lower portion were of knotty pine. There was a dead or open space between the north wall of the lower floor and the irregular rock ledge, and this space varied in width from 4 inches to 4 feet.

The lower floor of the house consisted of one large room, 18 x 24 feet, used as a combined kitchen and dining room, and a bathroom, 9 x 10 feet, built just off the large room on the southwest corner of the house. There was a stairway 4 feet wide between the bathroom and the kitchen-dining room. A hot water heater closet was located in a 3 x 5 feet recess opening from the bathroom, the north side of the recess being against the rock ledge. A so-called dark room, 4 x 10 feet, was located back or north of the knotty pine wall of the northwest corner of the large room. The north wall of this room was a partially built up brick wall against the rock ledge. There was a narrow opening between the west end of the brick wall and the rock ledge. This room had no finished ceiling, the floor of the second story immediately above it and the supporting joists being exposed. These joists, 2 x 10 inches, ran north and south and extended north over the rock ledge. They were about 2½ feet apart.

The upper floor of the house had three rooms, a large living room running across the north side of the house and two bedrooms south of the living room. There was an unused fireplace about midway of the north wall of the living room. The walls and ceiling of the living room were of knotty pine. The bedroom walls and ceilings were of celotex. The floors of all rooms were hardwood. There was a 4 inch space between the inner and outer walls of the second story of the house, and this dead space connected with the dead space below between the walls of the first floor and the rock ledge. The bedroom in the southeast corner of the house was occupied by Elmer Holloway, brother of Leon Holloway. In the floor of the southeast corner of this bedroom, about 2 or 3 inches from the east wall and 1½ to 3 feet from the south wall, was a hole about 3 x 4 inches in size which extended to the ceiling of the lower floor. In this hole were two wires for an electrical connection.

The Skelgas system in plaintiffs' house was installed by the defendant for the original owner of the house about two years before its purchase by the plaintiffs. It is not contended that the distribution system originally installed by the defendant was in any manner defective. It consisted of a drum or cylinder of Skelgas, a pressure regulator attached to the cylinder, and a distribution line connecting the cylinder to a hot water heater and a cook stove in the house. The Skelgas cylinder was mounted on concrete blocks outside of the house. The hot water heater and the cook stove in the house were connected with the cylinder by a ½ inch copper pipe line. This line entered the house through an opening in the west rock wall of the lower floor, passed through the dead space between the north bathroom wall and the rock ledge, thence east and down to the hot water heater, and continued on under the stairway and through the dead space between the north wall of the kitchen and the rock ledge to a point back of the stove, where it passed through the north wall of the kitchen and connected with the stove. The total distance from the point of entry of the pipe line to the cook stove was 21 feet, 9 inches, but 10 feet of extra tubing or pipe was coiled back of the stove. About 1½ feet of the pipe line extended into the kitchen at the stove connection. The height of the dead space through which the line ran was 7 feet, 10 inches, the height of the lower floor ceiling plus the 10 inch joists.

The house was wired for electricity. Plaintiffs' evidence was that the house was properly and safely wired.

The house was heated only with a coal oil circulating heater located in the kitchen 8 feet from the east wall and 2½ feet from the south wall. This heater was about 4 feet high, with a burner 12 to 18 inches above the floor. It was fed by a fuel oil drum placed outside of the house and con-

nected with this drum by a ⅜ inch iron pipe which ran through the south wall about 10 inches above the floor. A 4 inch stovepipe ran upward from the top of the heater, turned horizontally, and ran through a metal flange in a windowpane to the outside of the south wall, then vertically up and above the eaves of the south wall.

Skelgas is a propane gas. It is a liquefied petroleum gas to which for commercial use an offensive odor is added so that its escape can be readily detected by the sense of smell. It is marketed in liquid form in cylinders or drums. While in liquid form it is under pressure of 90 lbs. to the square inch. It is released from the cylinder in the form of gas by means of a regulator attached to the cylinder, which reduces the pressure in the gas line to 6 ounces per square inch. It is 1½ times as heavy as air, and escaping, it tends to settle down or seek the lowest level. Defendant's witnesses testified that Skelgas burns with a yellow flame unless it is mixed with the proper proportion of air; that a mixture of 1 part of gas to 24 parts of air produces a blue flame. The burners attached to the gas appliances in plaintiffs' house were equipped with a device to produce this mixture.

The lower explosive limit of Skelgas is 2.4 parts of gas to 97.6 parts of air; the upper explosive limit is 9.5 parts of gas to 90.5 parts of air. Below the lower explosive limit Skelgas will neither burn nor explode. Above the upper limit it will burn but not explode. It explodes on contact with flame at any point between its upper and lower explosive limits.

Plaintiffs testified that they first began to notice the escape of gas in the house in November 1944, and that the odor of escaping gas became stronger with passing time. Mr. Holloway testified that he first called the defendant on the telephone some time the latter part of November and asked the company to check his equipment because the last cylinder of gas, delivered in November, had not lasted as long as it should have lasted. The company then installed a larger size cylinder around the first of December. Thereafter, the odor of escaping gas was still noticeable, and Holloway complained to the company about a possible leak. He testified that he called four or five times before defendant sent its employees to the house on January 29, 1945. Mrs. Holloway corroborated this testimony, and stated that right after Christmas Day, 1944, she notified the defendant by telephone that there must be a leak from the cylinder or appliances in her house. Elmer Holloway and the mother and father of Mrs. Holloway testified that the Holloways were completely out of gas on Christmas Eve, 1944, and Mrs. Holloway said that no gas was available for use by them from that time until the day of the fire on January 29, 1945. The Holloways also testified that during the period mentioned there was no odor of escaping gas in the house.

The defendant denied receiving any telephone calls from the Holloways except one call from Mrs. Holloway on January 28, 1945, stating that the Holloways were out of gas and wanted the gas equipment checked. There was introduced in evidence a letter which defendant received from Mrs. Holloway on January 9, 1945. In the letter Mrs. Holloway complained about the cylinders of gas not lasting as long as they should have lasted, stated that she had made other complaints about the excessive use of gas, that Mr. Holloway thought that the cylinders of gas were not full when delivered, and that there might be a leaking valve on the cylinders when delivered. The letter requested an investigation by the gas company. Nothing was said in the letter about a possible leak in the gas equipment in the house or about the odor of escaping gas in the house, but the writer said she should not be required to pay for the cylinder of gas delivered on November 4, 1944, nor for the cylinder of gas delivered to her a few days before Christmas, until an investigator came out to see if there was anything wrong with the stove or hot water heater.

There is nothing in the record to show that the defendant took any action in response to the complaints contained in Mrs. Holloway's letter received on January 9, nor until the day after the receipt of the telephone call from her on January 28, 1945. On the day following this call defendant dispatched three of its employees to plain-

677

tiffs' house. One of these men was the usual delivery man who brought a new cylinder of Skelgas. The other two men were service men whose duties were to inspect plaintiffs' gas equipment and repair any defects which they discovered. These men arrived at the Holloway house about 10 o'clock on the morning of January 29. They testified that they first changed the location of the Skelgas cylinder outside of the Holloway house by moving it to a place more convenient for the delivery man to make replacements of empty cylinders. A new cylinder was then installed and connected with the Holloway service line, and a pressure gauge test was made at the cylinder for the purpose of discovering any leaks in the appliances or the gas distribution line. The test showed a small leak, and its location was discovered by applying liquid soap to all joints and connections in the line. The leak was in the flarenut of the hot water heater, and it was repaired by tightening the nut with a wrench. It was a very small leak. Thereafter, the pressure gauge test was again applied at the tank and a monometer test at the stove. A monometer is an apparatus for testing gas pressure. These tests, according to defendant's workmen, showed that there were no leaks in the appliances or any where in the distribution line, and so far as defendant's employees knew the tests were accurate and conclusive. They testified that they noticed no odor of gas while they were on the premises, and that no one complained to them of any odor of gas.

Mrs. Holloway was present in the house while defendant's employees were testing the gas line. Mr. Holloway and his brother had left shortly after defendant's employees arrived. Mrs. Holloway testified that defendant's employees made tests for leaks in the gas line by holding burning matches to the line and at the burners of the stove and the hot water heater. She said that the stove was tested first and a leak was discovered, and that afterwards the hot water heater was tested. She said one of defendant's employees told her he had found a large leak and had fixed it. She also testified that there was an odor of gas while defendant's employees were on the

premises, and she asked whether it was safe to use the stove and hot water heater, and was advised that it was.

Defendant's employees left the house some time between noon and 2 o'clock. Mr. Holloway and his brother, Elmer, returned to the house as defendant's employees were leaving. Their evidence was that the odor of gas was very strong. Mrs. Holloway testified that one of the defendant's employees asked her if she wanted him to light the hot water heater, and she told him to light it if it was safe to do so with all the gas in the house. She said the man lit the heater and told her that the gas which she smelled was due to the leak repaired by them. Defendant's workmen denied this, and denied that the heater was burning when they left the house. Mrs. Holloway testified that about 30 minutes after defendant's employees left the house she turned the heater down low so that it was barely burning. Both Mr. Holloway and his brother, Elmer, testified that when they returned to the house the odor of gas was so strong that Mr. Holloway said to Mrs. Holloway that he thought it was not safe to use the cook stove while the odor of gas remained.

Mr. and Mrs. Holloway left the house about 3:20 P.M. to go to their work at a nearby munitions plant, leaving Elmer Holloway and their two small children in the house. The weather was cold and the circulating oil heater was burning. Elmer Holloway testified that he smelled smoke about 3:40 P.M., that he looked at some beans which were cooking on the circulating heater and found that they were not burning or smoking, that he then went upstairs and discovered smoke coming out of the southeast bedroom. On going into the room he found that the southeast corner of the mattress on his bed which was over the hole in the floor containing the electric wires was smoldering. He picked up the mattress and saw flames coming through the hole in the floor. After throwing the mattress outside of the house, he returned to the bedroom and found that the smoke was thicker. He then knocked a hole in the celotex east wall of the bedroom about 3 or 4 feet from the floor and saw flames

678

between the inner and outer walls. The flames were bluish red. He ran downstairs and returned with water which he poured into the hole in the wall. This caused the flames to leap out towards the ceiling. His face was burned and his eyebrows singed. He ran downstairs for more water. Noticing smoke coming through the cracks down the stairway, he took the children outside, and ran back into the house, got a blanket and soaked it in a stream about 20 feet away, and took it back into the house to try to smother the fire. When he went back into the house he found both bedrooms in flames. He testified that only about 15 minutes elapsed from the time he first smelled smoke until the collapse of the upstairs floor, and that the house was completely burned in 35 minutes from the time he first smelled smoke. A witness testified that Elmer Holloway told him that the fire was caused by defective wiring, but Elmer Holloway denied this, and said that he told everyone he did not know what caused the fire. There was no flash or explosion of gas in the house at any time. Elmer Holloway said he was smoking cigarettes on the afternoon of the fire whenever he felt like it.

A Mr. Liberty, father of Mrs. Holloway, a mechanic with 14 years in the employment of a butane gas distributor in the installation of equipment for that gas on motor trucks and in servicing such equipment, testified that butane and propane gases were substantially the same. He was familiar with the odor of propane gas and with the construction of the Holloway house. He testified that if there had been a small leak at the connection of the hot water heater, so small that if ignited it would flicker and go out, in his opinion, the amount of gas escaping from such a leak would not have been noticeable in the house. He testified that butane, propane, and natural gas each burns with a blue flame, and that, in his opinion, the flame discovered by Elmer Holloway in his bedroom was a flame of burning gas.

Leon Holloway testified that he made an examination of the hole in the floor of Elmer Holloway's bedroom to see if the wires coiled up in the hole could be used as a source for a light in the bedroom. He found that the wires were dead. The joists supporting the second floor of the house ran north and south and across the dark room which had no ceiling, and in using the dark room he had stored small cans of paints and his chemicals on top of the ceiling of the kitchen between the joists. There was an opening under the floor of the upper rooms of the house directly connected with the dark room, and between the joists supporting the floors of the rooms on the upper level of the house. He said that at the time he examined the hole in the bedroom floor he went down into the dark room in an effort to find where the wires in the hole in the floor came out. He left his flashlight burning in the hole in the floor and looking from the dark room between the joists over the kitchen ceiling he could see the flashlight.

Two experts testified in the case, one for the plaintiffs and one for the defendant. The qualifications of neither were questioned. Their conflicting evidence need not be set out in detail. The expert testifying for the plaintiffs was of the opinion that the fire in the house was caused by escaping gas. Defendant's expert took the contrary position. Plaintiffs' witness gave as his opinion that escaping Skelgas could have been diffused throughout the dead space between the north wall of the lower floor and the rock ledge, that a combustible mixture of air and Skelgas could have been obtained and carried by convection currents set up by the heat from the lighted hot water tank from the lower floor to the second floor of the house, and laterally to the point where the fire was discovered. In his opinion the flame in the walls in the southeast bedroom of the house was that of burning Skelgas or some other gas. The defendant's expert was of the opinion that the required diffusion of Skelgas throughout the air in the dead space of the house could not have produced a combustible mixture of Skelgas and air, that at the most an explosive mixture would have been obtained, that instead of a fire an explosion would have occurred in the house, and that any mixture of Skelgas and air could not have reached the upper sections of the house.

The mere statement of the evidence shows how difficult it is for an appellate court to appraise it fairly from the printed record, and how important, if not decisive, in such an appraisal was the opportunity which the trial court had to hear and observe the witnesses on the stand. Obviously, the trial court might have resolved the issues of fact in favor of defendant. But we can not say that the opposite conclusion is without substantial basis in the evidence or that upon a consideration of all of the evidence it is clearly erroneous.

Whether defendant's employees exercised the degree of care required of them in their work, and whether as a result of their failure to exercise such care gas escaped and caused the fire which destroyed the house, were questions of fact for the trial court under the evidence in this case. The testimony of defendant's employees that they made the usual tests proper in such cases in their inspection, that they found and repaired all leaks in plaintiffs' gas equipment, and that they detected no odor of gas in the house after the work was completed was not uncontradicted as defendant asserts. The plaintiffs and Elmer Holloway testified to the extreme odor of escaping gas in the house when the work of inspection and repair was completed. Defendant's employees testified that they found only one small leak in the hot water heater and that they repaired it. Mrs. Holloway testified that they discovered another leak at the stove in the kitchen, and also that one of defendant's employees told her that they had discovered a large leak. Defendant's employees testified that the leak at the hot water heater was so small that it probably would not have supplied sufficient gas to burn if ignited. Two witnesses testified for the plaintiffs that such a small leak would not have permitted an escape of gas sufficient to be noticeable on the lower floor of the house, since a small volume of gas escaping at that heater probably would have moved into the open space back of the heater closet and between the north wall of the lower floor of the house and the rock ledge. Plaintiffs' expert witness testified that the strong odor of gas which persisted in the house after defendant's employees completed their work indicated that the gas came from another and larger leak. Defendant's employees testified that they applied liquid soap or soapsuds to the connections of the pipe line and the gas appliances as a means of detecting leaks, while Mrs. Holloway said that they made their inspection at these points by the use of lighted matches.

The evidence revealed no other reasonably probable source of the fire, except the presence of gas throughout the walls and upper floor of the house. That the fire was first seen coming from the hole in the floor in the bedroom occupied by Elmer Holloway does not conclusively establish that place as the point at which the fire originated. Immediately after the discovery of the flame at the point mentioned, flames were also discovered in the walls of the bedroom, and within minutes thereafter.under the stairway leading from the lower floor to the upper floor of the house. The whole second floor of the house collapsed within 15 minutes after the discovery of the fire, and the house itself was completely destroyed within 35 minutes after its discovery. There was evidence that the flames discovered by Elmer Holloway coming from the hole in the bedroom floor and from the hole which he knocked in the wall of the bedroom were flames of burning gas. A gas company furnishing gas to a residence is charged with notice that residences are usually heated in cold weather, and that they are ordinarily supplied with electricity and electrical appliances, the presence and use of which equipment add to the hazards of escaping gas. If it could be said in this case that gas escaped from the distribution system and appliances in the plaintiffs' house as the result of the negligence of defendant's servants, and became ignited from fires in the house or from some unknown defect in the electrical equipment in the house, the negligence of defendant in permitting the gas to escape is nevertheless the proximate cause of the destruction of the house, in the absence of some allegation and proof of contributory negligence. Brown v. Kansas Natural Gas Co., 8 Cir., 299 F. 463.

680

Nor can it be said on this record that the court's finding that the fire was caused by escaping gas is contrary to conclusively established physical facts and natural laws. The argument on this aspect of the case is based upon known properties of Skelgas. Briefly stated, it is that within the time elapsing between the hour at which defendant's employees finished their work of inspection and repair and the discovery of the fire by Elmer Holloway, it was impossible, conceding the escape of gas, its diffusion, and mixture with air, for the mixture of air and gas in the open space between the rock ledge and the north wall of the lower floor of the house, between the joists supporting the floor on the second level of the house, and in the walls of the second floor of the house, to have reached a concentration above the explosive limit of Skelgas; or, in other words, that within the time specified any possible mixture of Skelgas and air, conceding that such a mixture could have occurred, would have remained within the explosive limits of Skelgas, and that instead of a fire in the house there would have been an explosion at the instant of contact of the Skelgas-air mixture with flame.

In support of this contention recourse is had to laws of physics concerning the rate of expansion of gases; the time required for two gases of equal temperature and pressure to mix by diffusion in the absence of the application of heat or mechanical action, such as the difference in pressure of the two gases; and to a generally accepted formula for the computation of the rate of the flow of gases. The difficulty with defendant's argument and computations is that too many of the decisive factors are only approximately known, if known at all. Under the evidence the volume of the space in which escaping Skelgas became diffused throughout the air can not be determined with any degree of accuracy. The time during which the gas escaped is not known. Nothing in the evidence justifies the assumption that there was no escape of gas into the house prior to the time defendant's employees finished their work. On the contrary, the reasonable assumption is that gas began to escape at the moment the new cylinder of gas was connected with plaintiffs' distribution system. What part, if any, of the gas escaping before the day of the fire remained in the walls of the house is not known. Beyond the fact that plaintiffs' evidence was that convection currents moving through the open space between the north wall of the lower floor of the house and the rock ledge could have caused a combustible mixture of Skelgas and air to rise from the lower part of the house vertically, to reach the level of the second floor, to continue this vertical course through spaces in the walls of the second floor, and to move laterally between the joists supporting the floor of the upper story to the point where the fire was discovered, nothing is known concerning the force or constancy of these currents.

Affirmed.